2013 COA 20

TAXPAYERS FOR PUBLIC EDUCATION; Cindra S. Barnard; Marson S. Barnard; James LaRue; Suzanne T. Larue; Interfaith Alliance of Colorado; Rabbi Joel R. Schwartzman; Reverend Malcolm Himschoot; Kevin Leung; Christian Moreau; Maritza Carrera; and Susan McMahon, Plaintiffs–Appellees,

v.

DOUGLAS COUNTY SCHOOL DISTRICT; Douglas County Board of Education; Colorado State Board of Education; and Colorado Department of Education, Defendants–Appellants

and

Florence and Derrick Doyle, on Their Own Behalf and as Next Friends of Their Children, A.D. and D.D.; Diana and Mark Oakley, on Their Own Behalf and as Next Friends of Their Child, N.O.; Jeanette Strohm–Anderson and Mark Anderson, on Their Own Behalf and as Next Friends of Their Child, M.A., Intervenors–Appellants.

Nos. 11CA1856 & 11CA1857

Colorado Court of Appeals, Div. IV.

Announced February 28, 2013

834

Faegre Baker Daniels LLP, Michael S. McCarthy, Colin C. Deihl, Caroline G. Lee, Thomas A. Olsen, Denver, Colorado; Alexander Halpern LLC, Alexander Halpern, Boulder, Colorado, for Plaintiffs–Appellees Taxpayers for Public Education, Cindra S. Barnard, and Mason S. Barnard

Arnold & Porter LLP, Matthew J. Douglas, Timothy R. Macdonald, Michelle K. Albert, Denver, Colorado; American Civil Liberties Union Foundation of Colorado, Mark Silverstein, Sara Rich, Denver Colorado; ACLU Foundation Program on Freedom of Religion and Belief, Daniel Mach, Heather L. Weaver, Washington, D.C.; Americans United for the Separation of Church and State, Ayesha N. Khan, Alex J. Luchenitser, Washington, D.C., for Plaintiffs–Appellees James LaRue, Suzanne T. Larue, Interfaith Alliance of Colorado, Rabbi Joel R. Schwartzman, Reverend Malcolm Himschoot, Kevin Leung, Christian Moreau, Maritza Carrera, and Susan McMahon

Rothgerber Johnson & Lyons, LLP, James M. Lyons, Eric V. Hall, Denver, Colorado, Gibson, Dunn & Crutcher LLP, James C. Ho, Lawrence C. VanDyke, for Defendants–Appellants Douglas County School District and Douglas County Board of Education

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Antony Dyl, Senior Assistant Attorney General, Frederick R. Yarger, Assistant Solicitor General, Denver, Colorado, for Defendants–Appellants

Colorado State Board of Education and Colorado Department of Education

Institute for Justice, William H. Mellor, Arlington, Virginia; Michael E. Bindas, Seattle, Washington; Timothy D. Keller, Tempe, Arizona; Wilkinson Barker Knauer, LLP, Raymond L. Gifford, Denver, Colorado, for Intervenors–Appellants

The Legal Center, Randy L. Parcel, Chester R. Chapman, Denver, Colorado, for Amicus Curiae The Legal Center for People with Disabilities and Older People

Burg Simpson Eldredge Hersh & Jardine, PC, Stephen Burg, Daniel McKenzie, Englewood, Colorado, for Amicus Curiae Anti–Defamation League

Husch Blackwell LLP, Jeffrey A. Chase, Elizabeth L. Harris, Denver, Colorado, for Amici Curiae American Federation of Teachers and American Association of School Administrators

Bryan Cave HRO, Stuart Lark, Colorado Springs, Colorado, for Amici Curiae Association of Christian Schools International, Catholic Diocese of Colorado Springs, Shepherd of the Hills Christian School, and Valor Christian High School

Sparks Willson Borges Brandt & Johnson, P.C., Scott W. Wilson, Colorado Springs, Colorado, for Amicus Curiae The Becket Fund for Religious Liberty

Kutz & Bethke LLC, William P. Bethke, Lakewood, Colorado, for Amicus Curiae Vision Home & Community, Inc.

Opinion by JUDGE J. JONES

¶ 1 In 2011, the Douglas County Board of Education (County Board) adopted the Choice Scholarship Program (CSP). Pursuant to the CSP, parents of eligible elementary school, middle school, and high school students residing in the Douglas County School District (District) may choose to have their children attend certain private schools, including some with religious affiliation. The District would pay parents of participating students "scholarships" covering some of the cost of tuition at those schools, and the parents would then remit the scholarship money to the schools.

¶ 2 Plaintiffs are nonprofit organizations, Douglas County taxpayers, District students, and parents of District students. They filed suit to enjoin implementation of the CSP, claiming that it violates the Public School Finance Act of 1994, sections 22–54–101 to –135, C.R.S.2012 (the Act), and various provisions of the Colorado Constitution.[1]

¶ 3 Following a hearing on plaintiffs' motion for a preliminary injunction, the district court found that the CSP violates the Act and most of the constitutional provisions at issue. The court permanently enjoined implementation of the CSP.

¶ 4 We conclude that plaintiffs do not have standing to seek redress for a claimed violation of the Act, and that the CSP does not violate any of the constitutional provisions on which plaintiffs rely. Therefore, we reverse the district court's judgment and remand the case for entry of judgment in defendants' favor.

I. Background

A. The CSP

¶ 5 We glean the facts largely from the district court's written order and, to the extent uncontested, testimony given and exhibits admitted during the preliminary injunction hearing.

¶ 6 The District created a task force to study a variety of school choice strategies for District students. The task force submitted a report to the District identifying about thirty strategies for improving school choice, and submitted a plan for implementing one of those strategies, the CSP, to the County Board. In March 2011, the County Board approved the CSP on a "pilot program" basis for the 2011–2012 school year, limited to 500 students. The following aspects of the CSP bear on the issues raised by the parties.

· The purposes of the CSP are "to provide greater educational choice for students

---

1. Parents of five children who had applied for and received scholarships under the CSP intervened in the cases to defend the program.

and parents to meet individualized student needs, improve educational performance through competition, and obtain a high return of investment of [District] educational spending."

· Private schools, including private schools that are not located in Douglas County, may apply to participate in the CSP.

· Private schools applying to participate in the CSP must provide information about a variety of matters, and must satisfy a variety of eligibility criteria, some of which relate to academic rigor, accreditation, student conduct, and financial stability. Participating private schools must agree to allow the District to administer assessment tests to District students participating in the CSP.

· Participating private schools are prohibited from discriminating "on any basis protected under applicable federal or state law." But, the CSP does not require as a condition of participation that any private school modify employment or enrollment standards that are based on religious beliefs.

· The CSP provides for District oversight of private schools' compliance with program requirements, and reserves to the District the ability to withhold payments or terminate participation for noncompliance.

· Thirty-four private schools applied to participate in the CSP for the 2011–2012 school year. The District contracted with twenty-three of those schools.

· Of the twenty-three private schools contracting with the District, fourteen are located outside Douglas County, and sixteen teach religious tenets or beliefs. Many are funded at least in part by and affiliated with particular religious organizations.

· Many of the participating private schools base admissions decisions at least in part on students' and parents' religious beliefs

and practices. Many also require students to attend religious services. However, the CSP expressly gives students the right to "receive a waiver from any required religious services at the [participating private school]." [2]

· Students are eligible to participate in the CSP only if they are District residents (open-enrolled students are not eligible), have resided in the District for at least one year, and were enrolled in District public schools during the 2010–2011 school year. Any such student desiring to participate in the CSP must complete an application to be submitted to the District and must agree to take state assessment tests.

· Students accepted by the District to participate in the CSP are formally enrolled in the Choice Scholarship Charter School (Charter School). The Charter School administers the CSP, contracting with the participating private schools and monitoring students' class schedules and attendance at participating private schools. It does not have a building, teachers, or curriculum.

· Each student accepted to participate in the CSP must also be accepted for enrollment in a participating private school chosen by the student's parents. The CSP encourages students and parents to investigate participating private schools' "admission criteria, dress codes and expectations of participation in school programs, be they religious or nonreligious."

· The sole source of funding for the CSP is the total "per pupil revenue" received by the District for the Charter School pursuant to section 22–30.5–112(2)(a.5), C.R.S. 2012. The fund of money from which "per pupil revenue" is distributed comprises District property and other ownership taxes and state revenue. §§ 22–54–103(11), –104.1, –106(1)(a)(I), C.R.S.2012.[3]

---

**2.** The district court found that this "opt out" provision is "illusory" because "scholarship students may still be required to attend religious services, so long as they are permitted to remain silent." We discuss the effect of this opt out provision briefly in Part II.B.1 below.

**3.** As of the date of the preliminary injunction hearing, the Colorado State Board of Education (State Board), which is statutorily charged with determining and distributing per pupil revenue, had not yet decided whether it would count students enrolled in the Charter School for purposes of determining the District's total per pupil revenue.

· The District counts all students enrolled in the Charter School toward its total pupil count for purposes of receiving per pupil revenue. *See* § 22–54–103(10) (defining "pupil enrollment" for purposes of calculating per pupil revenue).

· For each student participating in the CSP, the District (acting through the Charter School) pays scholarships of the lesser of the participating private school's charged tuition or seventy-five percent of the "per pupil revenue" received by the District. (The District retains the remaining twenty-five percent.) The participating student's parents are responsible for paying any difference. The District estimated that per pupil revenue for the 2011–2012 school year would be $6,100, meaning that up to $4,575 could be paid for student tuition at a participating private school.

· The CSP provides that scholarship payments will be made by check, in four equal installments, to parents of participating students. Parents are required to then endorse the checks to the participating private schools.

### B. The District Court Proceedings

¶ 7 Plaintiffs, acting in two groups, filed complaints seeking a declaration that the CSP is unlawful and an order enjoining implementation of the CSP. Their claims are based on the Act and seven provisions of the Colorado Constitution. Plaintiffs named the Colorado Department of Education, the State Board, the County Board, and the District as defendants. The cases were consolidated.

¶ 8 Defendants moved to dismiss the complaints for failure to state a claim for relief. Plaintiffs moved for a preliminary injunction.

The court held a three-day hearing on the motions for a preliminary injunction, after which the court issued a detailed written order denying defendants' motion to dismiss and finding that the CSP violates the Act and article II, section 4; article V, section 34; and article IX, sections 3, 7, and 8 of the Colorado Constitution. (The court found that the CSP does not violate two constitutional provisions on which plaintiffs rely, article IX, sections 2 and 15.)

 ¶ 9 Acting sua sponte, the court permanently enjoined implementation of the CSP. The parties apparently agree that the court's order constitutes a final disposition of all claims.[4]

### II. Discussion

¶ 10 For clarity of analysis, we divide plaintiffs' claims into three groups: (1) claims alleging violations of statutory and constitutional provisions which concern state schools generally—the Act and article IX, sections 2, 3, and 15; (2) claims alleging violations of constitutional provisions which concern aid to or support of religion and religious organizations—article II, section 4, and article IX, sections 7 and 8; and (3) the claim alleging a violation of article V, section 34, which concerns appropriations generally and appropriations to religious organizations specifically.

### A. Public Funding and Control Claims

#### 1. The Act—School Funding

¶ 11 Plaintiffs claim that the CSP violates the Act because "[the District] will impermissibly use State monies distributed by the Colorado Department of Education to pay for private school tuition at private schools."

4. In effect, the district court consolidated the preliminary injunction hearing with the trial on the merits. *See* C.R.C.P. 65(a)(2). A court should not consolidate the preliminary injunction hearing with the trial on the merits absent notice to and agreement of the parties. *See Graham v. Hoyl*, 157 Colo. 338, 340–41, 402 P.2d 604, 605–06 (1965); *Leek v. City of Golden*, 870 P.2d 580, 585 (Colo.App.1993); *Litinsky v. Querard*, 683 P.2d 816, 819 (Colo.App.1984). Following opening statements, the district court informed the parties that because it seemed a preliminary injunction would have the effect of granting plaintiffs all the relief they had requested, plaintiffs

would have to show that their right to relief was "clear and certain." *See Allen v. City & Cnty. of Denver*, 142 Colo. 487, 489, 351 P.2d 390, 391 (1960). Toward the end of the last day of the hearing, the district court indicated that it was considering whether a later trial would be necessary. But the court did not clearly inform the parties that it intended to consolidate the hearing with the trial on the merits. And no party stipulated to that procedure. Nonetheless, on appeal, no party challenges the court's decision to consolidate the hearing with the trial on the merits. Nor does any party complain about a lack of opportunity to present additional evidence.

*See* § 22–54–104(1)(a) (the amount calculated under the Act as the "financial base of support for public education in the district ... shall be available to the district to fund the costs of providing public education"). After rejecting defendants' challenge to plaintiffs' standing to seek judicial enforcement of the Act, the district court found that the CSP violates the Act because it "effectively results in an increased share of public funds to [the District] rather than to other state school districts."[5]

¶ 12 We need not address the merits of plaintiffs' claim under the Act because we conclude that plaintiffs lack standing to bring it.

¶ 13 Whether a plaintiff has standing to bring a particular claim presents a question of law that we review de novo. *Barber v. Ritter,* 196 P.3d 238, 245 (Colo.2008); *Ainscough v. Owens,* 90 P.3d 851, 856 (Colo. 2004).

¶ 14 To establish standing, a plaintiff suing in Colorado state court must establish that (1) it incurred an injury-in-fact; and (2) the injury was to a legally protected interest. *Barber,* 196 P.3d at 245; *Ainscough,* 90 P.3d at 855; *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 538 (1977). Our inquiry here focuses on the second requirement.[6]

¶ 15 In determining whether a statute gives a particular plaintiff a legally protected interest, we look to whether the General Assembly clearly intended to create a private right of action. *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 923 (Colo. 1997) ("[W]e will not infer a private right of action based on a statutory violation unless we discern a clear legislative intent to create such a cause of action."). The Act does not expressly authorize a private cause of action to enforce its provisions. Therefore, we look to three factors to determine whether a private cause of action is clearly implied: (1) whether the plaintiffs are within the class of

persons intended to be benefitted by the Act (specifically, by section 22–54–104(1)); (2) whether the General Assembly intended to create, albeit implicitly, a private right of action; and (3) whether an implied private right of action would be consistent with the purposes of the Act. *Id.*; *Allstate Ins. Co. v. Parfrey,* 830 P.2d 905, 911 (Colo.1992).

¶ 16 The district court recited these factors but did not engage in any substantive analysis of them. Instead, the court conclusorily ruled that certain plaintiffs' status as District students and parents of District students "confers a legal interest in the enforcement of the statutes enumerated in their claims." In so ruling, the district court erred.

¶ 17 Assuming that the plaintiffs who are District students and parents of District students are within the class of persons intended to be benefitted by the Act, examination of the other two factors does not support the existence of a private cause of action.

¶ 18 There is nothing in the language of the Act remotely suggesting that private citizens or groups have a right to seek judicial enforcement of its provisions. The Act expressly commits enforcement of its provisions to the State Board. § 22–54–120(1), C.R.S.2012 ("The state board shall make reasonable rules and regulations necessary for the administration and enforcement of this article."). And the Act provides a number of mechanisms for ensuring compliance with its funding scheme, none of which contemplate private enforcement. *E.g.,* §§ 22–54–104 (providing in detail how the State Board shall determine each district's total per pupil revenue), –114 to –115 (providing in detail how money in the state public school fund is to be appropriated and distributed),—115(4) (providing means for the State Board to recover any overpayment of state moneys to a district), –129(6)(a)-(b) (providing that the State Board "shall promulgate rules ... as neces-

---

**5.** As discussed below in Part II.A.2, there is no record support for this finding. Though, as the district court noted, the CSP is structured to allow participating students to be counted for purposes of determining the District's total per pupil revenue, it does not follow that this results in any increase in the District's share. This is because the record evidence indicates that par-

ticipating students would otherwise be enrolled in District public schools.

**6.** This is not to say that we necessarily agree with plaintiffs that they demonstrated injury-in-fact. We focus on the second prong of the standing test because plaintiffs' failure to satisfy that prong is most clear.

sary for the administration and enforcement of this section").

¶ 19 Where, as here, a statute provides a means of enforcement, the designated remedy ordinarily excludes all others. *See Gerrity Oil & Gas Corp.*, 946 P.2d at 924–25; *cf. Bd. of Cnty. Comm'rs v. Moreland*, 764 P.2d 812, 817–21 (Colo.1988) (statute which provided specific remedies for violations thereby indicated that the General Assembly had considered the issue of civil liability but had chosen not to make any provision therefor); *Macurdy v. Faure*, 176 P.3d 880, 883 (Colo.App.2007) (statute which entrusted decision whether to perform an autopsy to government officials did not contemplate a private right of action to compel officials to perform an autopsy); *Prairie Dog Advocates v. City of Lakewood*, 20 P.3d 1203, 1208 (Colo.App.2000) (statute which prohibited poisoning wildlife and subjected violators to penalties reserved enforcement to the state, and therefore did not create a private cause of action); *Axtell v. Park Sch. Dist. R–3*, 962 P.2d 319, 320–21 (Colo.App.1998) (because Evaluation Act provided a specific remedy for violations by school districts—withholding or suspension of accreditation by the State Board—it did not create an independent private right of action); *Minnick v. City & Cnty. of Denver*, 784 P.2d 810, 812 (Colo.App. 1989) (city ordinance which imposed a prevailing wage requirement on public works projects, and which provided a remedy for violations—withholding payments to contractors—did not create a private right of action); *Silverstein v. Sisters of Charity*, 38 Colo.App. 286, 288–89, 559 P.2d 716, 718 (1976) (statute which provided a criminal penalty for violations did not allow a private civil action for damages; quoted with approval in *Moreland* ).

¶ 20 Nor would recognizing a private cause of action be consistent with the Act's purposes. The Act addresses in a detailed way what is a rather vague constitutional requirement. *See* § 22–54–102(1), C.R.S.2012 (the Act "is enacted in furtherance of the general assembly's duty under section 2 of article IX of the state constitution to provide for a thorough and uniform system of public schools throughout the state"). It requires the responsible state agencies (the Colorado Department of Education and the State Board) to engage in constant evaluation and oversight of all local school districts and to manage large sums of money (in amounts which change annually, if not more frequently). As discussed, the State Board is also entrusted with enforcing the Act, and the Act provides mechanisms for the State Board to exercise that authority.

¶ 21 In light of the scope and complexity of the statutory scheme, the responsible state agencies require a certain degree of discretion and flexibility in carrying out their oversight and enforcement responsibilities. We are persuaded that allowing private citizens to act as substitute boards of education by challenging districts' actions in court would interfere with the state agencies' efforts to meet their statutory obligations. And, it would introduce uncertainty into a process where little can be tolerated. Local school districts, for example, would not be able to rely on decisions of the state agencies if those decisions were open to court challenge by any disgruntled citizen.

¶ 22 Therefore, consideration of the relevant factors leads us to conclude that plaintiffs do not have standing to bring a private cause of action seeking enforcement of the Act.

¶ 23 We are not persuaded to the contrary by plaintiffs' arguments.

¶ 24 Though plaintiffs argue that "absent a private right of action, the statute lacks any mechanism to hold an offending school district accountable," that is plainly not the case. *See, e.g.*, § 22–54–115(4) (providing means of recouping overpayments to local school districts). Plaintiffs' *ad hominem* assertion that no enforcement mechanism exists because "the State Board has essentially colluded with the offending district" is unsupported by the record. And, in any event, plaintiffs cite no authority for the proposition that a private right of action must be allowed where the agency charged with enforcing a statute declines to act in a particular instance. Any such disagreement over the necessity of enforcement must be left to the political process.

¶ 25 Nor does taxpayer status give plaintiffs standing. Taxpayer standing is

recognized in the context of alleged constitutional violations. *E.g., Barber,* 196 P.3d at 245–47. Plaintiffs cite no authority holding that taxpayer status is sufficient to confer standing to seek judicial enforcement of a statute. Recognizing such standing would in most, if not all cases render unnecessary the standing analysis the supreme court has applied in this context for decades.

¶ 26 Finally, the cases on which plaintiffs rely are distinguishable. In *Board of County Commissioners v. Bainbridge, Inc.,* 929 P.2d 691 (Colo.1996), the plaintiffs' claims alleged constitutional violations, *id.* at 696 n. 6, and the court did not address standing. Likewise, the plaintiffs' claims in both *Lobato v. State,* 216 P.3d 29 (Colo.App.2008), *rev'd,* 218 P.3d 358 (Colo.2009), and *Boulder Valley Sch. Dist. RE–2 v. Colo. State Bd. of Educ.,* 217 P.3d 918 (Colo.App.2009), alleged violations of the state constitution. *Lobato,* 216 P.3d at 32, 35; *Boulder Valley Sch. Dist.,* 217 P.3d at 921–22. As discussed, the standing analyses for constitutional and statutory claims are different: the standing inquiry for statutory claims is more rigorous.

¶ 27 Because we have determined that plaintiffs do not have standing to seek judicial enforcement of the Act, we need not examine the parties' arguments on the merits.

### 2. Article IX, § 2—Thorough and Uniform System of Free Public Schools

¶ 28 As relevant here, article IX, section 2 of the Colorado Constitution requires the General Assembly to "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state . . . ." The district court found against plaintiffs on their claim alleging a violation of this provision because they had not presented "sufficient evidence that [the CSP] prevents students from otherwise obtaining a free education in Douglas County."

¶ 29 On appeal, plaintiffs contend that the court erred in rejecting this claim because (1) students participating in the CSP are not educated gratuitously (as the CSP may cover only part of a participating student's private school tuition); (2) educational programs at the participating private schools vary; and (3) by retaining twenty-five percent of per pupil revenue pursuant to the CSP, the District receives money that otherwise would go to other school districts.

¶ 30 Initially, we reject the state defendants' argument that because plaintiffs have not cross-appealed the district court's adverse ruling on their article IX, section 2 claim, they may not raise these contentions on appeal.

¶ 31 "The general rule is that an appellee must file a cross-appeal in order for an appellate court to consider an alleged error of the trial court which prejudiced the appellee." *Blocker Exploration Co. v. Frontier Exploration, Inc.,* 740 P.2d 983, 989 (Colo.1987). But, "[w]ithout filing a cross-appeal, . . . an appellee may raise any argument in support of the trial court's judgment, so long as the appellee does not seek to increase its rights under the judgment." *Leverage Leasing Co. v. Smith,* 143 P.3d 1164, 1167–68 (Colo.App.2006); *see Blocker,* 740 P.2d at 989.

¶ 32 Plaintiffs do not seek to increase their rights under the judgment. If they are successful on these contentions they will not be entitled to any relief in addition to or different from that already awarded by the district court. The mere fact that plaintiffs pled a stand-alone claim based on article IX, section 2 does not, contrary to the state defendants' assertion, mean that success on these contentions would increase their rights under the judgment. *See Evans v. Romer,* 854 P.2d 1270, 1275 & n. 7 (Colo.1993) (supreme court was not limited in assessing only the constitutional right relied on by the district court in striking down the provision at issue because the plaintiffs-appellees were not seeking to increase their rights under the judgment); *cf. Blum v. Bacon,* 457 U.S. 132, 137 n. 5, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982) (the appellee could raise a statutory argument on appeal that had been rejected by the lower court despite not having filed a cross-appeal because his relief under the judgment granting an injunction would not be modified); *Dandridge v. Williams,* 397 U.S. 471, 476 & n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (the appellee could argue that the regulation at issue violated a statute, even thought the appellee had lost on that claim

and had not filed a cross-appeal); *Castellano v. Fragozo*, 352 F.3d 939, 960 (5th Cir.2003) (despite not having filed a cross-appeal, the plaintiff could defend the judgment based on a constitutional claim that had been dismissed because he was not attempting to expand his rights under the judgment); *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1206 (2d Cir.1978) (appellee which did not cross-appeal from dismissal of claim alleging a violation of statute could nonetheless argue such violation on appeal as grounds for affirming injunctive relief); *but see Robertson v. City & Cnty. of Denver*, 874 P.2d 325, 327 nn. 2 & 5 (Colo.1994) (because the plaintiffs did not cross-appeal, they could not argue on appeal that the district court erred in rejecting certain constitutional challenges to the ordinance there at issue).

¶ 33 Therefore, we address the merits of plaintiffs' contentions. And we conclude that plaintiffs' contentions fail.

 ¶ 34 We review de novo the district court's determination whether the CSP is constitutional. *Owens v. Congress of Parents, Teachers and Students*, 92 P.3d 933, 942 (Colo.2004). To the extent the district court made findings of historical fact based on conflicting evidence, however, we review such findings for clear error. *See People in Interest of A.J.L.*, 243 P.3d 244, 249–50 (Colo. 2010). A finding of fact is clearly erroneous only if it has no record support. *Id.* at 250; *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383–84 (Colo.1994).[7]

 ¶ 35 We recognize that legislative acts are entitled to a presumption of constitutionality. *See Owens*, 92 P.3d at 942. Plaintiffs argue that we should not apply the presumption to the CSP because it is not a statute enacted by the General Assembly or a municipal ordinance. That view of the presumption's application is too narrow.

¶ 36 The presumption of constitutionality stems from an appreciation of the separation of powers established by the Colorado Constitution; "thereby, the judiciary respects the roles of the legislature and the executive in the enactment of laws." *City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 440 (Colo.2000). Contrary to plaintiffs' suggestion, Colorado case law does not suggest that this respect is limited to statutory enactments of the General Assembly and analogous enactments of municipal governments. Colorado appellate courts have also applied the presumption to, for example, administrative regulations adopted by administrative agencies, *e.g., Colo. Civil Rights Comm'n v. Travelers Ins. Co.*, 759 P.2d 1358, 1366 (Colo.1988); an internal rule adopted by the state House of Representatives, *Grossman v. Dean*, 80 P.3d 952, 964 (Colo.App.2003); and, as perhaps most apt here, resolutions adopted by a board of county commissioners, *Asphalt Paving Co. v. Bd. of Cnty. Comm'rs*, 162 Colo. 254, 264–65, 425 P.2d 289, 295 (1967).

 ¶ 37 We are not persuaded that legislative acts of school districts' boards of education merit different treatment. Pursuant to article IX, section 15 of the Colorado Constitution, the General Assembly created local school districts governed by boards of education. The directors of the boards are elected by qualified district electors, and "have control of instruction in the public schools of their respective districts." Colo. Const. art. IX, § 15. By statute, local boards are entrusted with extensive duties and powers (including, for example, the power of eminent domain), which they carry out and exercise through the adoption of policies, rules, and regulations. §§ 22–32–103(1), –109 to –109.7, –110, –110.6, –110.7, C.R.S.2012. Thus, the boards are legislative bodies. And they are political subdivisions of the state. *See Bagby v. Sch. Dist. No. 1*, 186 Colo. 428, 434–35, 528 P.2d 1299, 1302 (1974) ("A school district is a subordinate division of the government and exercising authority to effectuate the state's education purposes.... As such, school districts and the boards which run them are considered to be political subdivisions of the state." (citations omitted)). We should respect the role of such bodies no less than we do the role of the General Assembly.

¶ 38 Accordingly, we conclude that the CSP is entitled to a presumption of constitu-

---

7. We apply these standards of review to all of the district court's rulings on the constitutional provisions at issue.

tionality. Thus, we must uphold the CSP unless we conclude that plaintiffs proved that it is unconstitutional beyond a reasonable doubt. *Owens,* 92 P.3d at 942; *People in Interest of City of Arvada v. Nissen,* 650 P.2d 547, 550 (Colo.1982). "In addition, we must uphold the [enactment] unless a clear and unmistakable conflict exists between the [enactment] and a provision of the Colorado Constitution." *Owens,* 92 P.3d at 942 (internal quotation marks omitted; quoting in part *E–470 Pub. Highway Auth. v. Revenig,* 91 P.3d 1038, 1041 (Colo.2004)).[8]

¶ 39 We now turn to the merits of plaintiffs' contentions under article IX, section 2.

■ ¶ 40 As noted, the district court rejected plaintiffs' contention that the CSP denies students a "free" public education because there was insufficient evidence that any student would be denied the opportunity to receive a free public education in Douglas County. The record supports this finding. Indeed, plaintiffs do not even argue to the contrary. Rather, they argue that because students participating in the CSP may not receive a free education (because parents must pay the difference remaining after remittance of the scholarships), the CSP necessarily violates article IX, section 2.

¶ 41 Plaintiffs misapprehend the constitutional mandate. It requires that a thorough and uniform system of free elementary through high school education be made available to students between the ages of six and twenty-one. *See Lujan v. Colo. State Bd. of Educ.,* 649 P.2d 1005, 1025 (Colo.1982) (this provision "is satisfied if thorough and uniform educational opportunities are available through state action in each school district"); *cf. Simmons–Harris v. Goff,* 86 Ohio St.3d 1, 711 N.E.2d 203, 212 (1999) (holding that a program similar to the CSP did not violate the Ohio Constitution's requirement of "a thorough and efficient system of common schools" because it did not undermine that state's obligation to public education at current funding levels); *Davis v. Grover,* 166 Wis.2d 501, 480 N.W.2d 460, 473–74 (1992) (applying a similar constitutional provision to

a similar school choice program and holding that it requires only that the legislature provide the opportunity to receive a uniform basic education). It plainly is not violated where a local school district decides to provide educational opportunities in addition to the free system the constitution requires. *Lujan,* 649 P.2d at 1025 (article IX, section 2 "does not prevent a local school district from providing additional educational opportunities beyond this standard"); *cf. In re Kindergarten Schools,* 18 Colo. 234, 234–36, 32 P. 422, 422–23 (1893) (requirement of article IX, section 2 did not prohibit General Assembly from establishing a public school system for educating children less than six years old). Nor is it violated merely because some students' parents may choose to have their children forego the available opportunity to attend a school within the system the constitution requires.

¶ 42 It is questionable whether plaintiffs' remaining contentions are preserved for review. Their briefs do not identify where in the record these contentions were raised, as required by C.A.R. 28(k), and our review of the motions for preliminary injunction, the arguments at the hearing, and plaintiffs' proposed findings does not reveal that they asserted these precise contentions in any substantial way. In any event, they fail as well.

■ ¶ 43 Any lack of uniformity, either among the instructional programs provided by the participating private schools and the public schools or amongst the various private schools themselves, does not render the CSP in violation of article IX, section 2. The requirement that the General Assembly create a thorough and uniform system of free public education does not preclude a local school district from providing educational opportunities in addition to and different from the thorough and uniform system. *See Lujan,* 649 P.2d at 1025.

¶ 44 Moreover, the fact the participating private schools ultimately receive funds distributed to the District as per pupil revenue does not transform the private schools into

**8.** The district court does not appear to have presumed the CSP constitutional or to have held plaintiffs to the burden of proving the CSP unconstitutional beyond a reasonable doubt. Its written decision striking down the CSP contains no mention of either standard. We also note that the dissent does not mention a standard of review.

public schools subject to the uniformity requirement. *See Jackson v. Benson*, 218 Wis.2d 835, 578 N.W.2d 602, 627–28 (1998) (rejecting claim that a parental choice program giving public funds to parents who enroll their children in certain private schools violated a constitutional provision requiring establishment of local schools "which shall be as nearly uniform as practicable"; funding mechanism did not transform private schools into public schools); *Davis*, 480 N.W.2d at 473–74 (same).

■ ¶ 45 Plaintiffs also are incorrect that because the CSP is structured to allow the District to retain twenty-five percent of per pupil revenue allocated for participating students, it diverts funds from other districts and thereby violates article IX, section 2, for at least two reasons.

¶ 46 First, this contention assumes that participating students would not be enrolled in District schools in the absence of the CSP. But, as plaintiffs' counsel conceded at oral argument, that assumption lacks evidentiary support in the record. Indeed, the evidence in the record bearing on this point indicates the contrary. As noted, to be eligible to participate in the CSP, students must be current District residents, must have been District residents for at least one year, and must have been enrolled in District public schools during the 2010–2011 school year (the school year immediately prior to the school year during which the CSP was to operate). And, also as noted, one purpose of the CSP is to provide greater educational choice to District students and parents—that is, choices not previously available to District students and parents because of financial limitations. Thus, if anything, the evidence in the record shows that the District's per pupil revenue would be the same in the absence of the CSP because the participating students would otherwise enroll in District public schools.[9]

9. The district court made a conclusory finding to the contrary. But we have found no evidence in the record supporting it, and plaintiffs point us to none. At oral argument, plaintiffs' counsel conceded that the only record evidence on this point supported the contrary conclusion.

10. In *Bush v. Holmes*, 919 So.2d 392 (Fla.2006), the Florida Supreme Court held that a school choice program violated a provision of the Flori-

¶ 47 Second, this contention posits an unduly restrictive view of the mandate of article IX, section 2. As discussed, local school districts may provide educational options to students in addition to that required by article IX, section 2. *See Lujan*, 649 P.2d at 1025; *Boulder Valley Sch. Dist.*, 217 P.3d at 927–28 (state system of charter schools does not violate article IX, section 2 because that provision does not prohibit making available additional educational opportunities); *see also Jackson*, 578 N.W.2d at 627–28 (rejecting argument premised on similar constitutional provision that similar school choice program diverted funds from the public school system). And they may expend public funds in doing so. *See* § 22–54–104(1)(a) ("the amounts and purposes for which [a district's total per pupil revenue] are budgeted and expended shall be in the discretion of the district").[10]

¶ 48 We therefore conclude that plaintiffs failed to prove beyond a reasonable doubt that the CSP violates article IX, section 2.

### 3. Article IX, § 3—Use of the Public School Fund

¶ 49 Article IX, section 3 provides in relevant part:

The public school fund of the state shall, except as provided in this article IX, forever remain inviolate and intact and the interest and other income thereon, only, shall be expended in the maintenance of the schools of the state, and shall be distributed amongst the several counties and school districts of the state, in such manner as may be prescribed by law. No part of this fund, principal, interest, or other income shall ever be transferred to any other fund, or used or appropriated, except as provided in this article IX....

da Constitution requiring a uniform system of free public schools. But the program at issue there, unlike the CSP, was funded by money that otherwise would have been distributed to local school districts. *Id.* at 402. And its reasoning—that the state is limited to funding one system, *id.* at 407—is inconsistent with *Lujan*. The court also explicitly based its decision on unique language in its constitution that is not found in article II, section 4. *Id.* at 405, 407 & n. 10.

¶ 50 The public school fund consists of the proceeds of land given to the state for educational purposes by the federal government upon Colorado's admission into the union, estates which escheat to the state, and gifts to the state for educational purposes. Colo. Const. art. IX, § 5; see 18 Stat. 474 § 7; *People in Interest of Dunbar v. City of Littleton*, 183 Colo. 195, 197, 515 P.2d 1121, 1121 (1973).

¶ 51 The district court held that the CSP violates article IX, section 3 because some of the District's total per pupil funding comes from the public school fund. The court reasoned that payments to parents would therefore include money from the public school fund, which would then be received by private schools. We do not agree with that analysis.

¶ 52 Article IX, section 3 requires only that money from the public school fund be "expended in the maintenance of the schools of the state" and "distributed amongst the several counties and school districts of the state, in such manner as may be prescribed by law." It plainly applies to distributions made by the state, not local districts. And it requires distributions to the counties and school districts. Upon distribution by the state to the counties and school districts, the money from the fund belongs to the counties and school districts. *Craig v. People in Interest of Hazzard*, 89 Colo. 139, 144–45, 299 P. 1064, 1066 (1931).

¶ 53 In ruling that the District directed public school fund money to participating private schools (through parents of participating students), the district court in effect assumed that once a district receives public school fund money from the state, all money the district expends is subject to the restriction of article IX, section 3. But article IX, section 3 is expressly a restriction on the use of only certain money—that of the public school fund. It does not suggest that the existence of some public school fund money in a district's total per pupil revenue subjects all money comprising the total per pupil revenue to its restriction.

¶ 54 It is undisputed that less than two percent of public school funding comes from the public school fund. (The District presented unrebutted evidence of this fact.) It is also undisputed that (1) at the time of the preliminary injunction hearing, there were approximately 58,000 students in District schools, only 500 of whom (or 0.86 percent) could enroll in the Charter School; and (2) the Charter School would retain twenty-five percent of per pupil revenue attributable to students participating in the CSP. Therefore, it does not follow that money from the public school fund would be diverted to private schools. Because we must presume the CSP is constitutional, *Danielson v. Dennis*, 139 P.3d 688, 691 (Colo.2006), construe the CSP in a manner avoiding constitutional infirmity, if possible, *Bd. of Directors v. Nat'l Union Fire Ins. Co.*, 105 P.3d 653, 656 (Colo.2005), and avoid seeking reasons to find the CSP unconstitutional, *Harris v. Heckers*, 185 Colo. 39, 41, 521 P.2d 766, 768 (1974), we must construe the CSP as funded out of the ninety-eight percent of total per pupil revenue that does not come from the public school fund. *See Danielson*, 139 P.3d at 691 (party challenging the constitutionality of a legislative enactment must establish that "[t]he precise point of conflict between [the legislative enactment] and the constitution ... appear[s] plain, palpable, and *inevitable*") (emphasis added) (quoting *Union Pac. Ry. Co. v. De Busk*, 12 Colo. 294, 303, 20 P. 752, 756 (1889)).[11]

¶ 55 Perceiving no plain, palpable, and inevitable conflict between the CSP and article IX, section 3, we conclude that plaintiffs did not meet their burden of establishing the unconstitutionality of the program under that provision.

### 4. Article IX, § 15—Local Control

¶ 56 Plaintiffs contend that the CSP violates article IX, section 15 of the Colorado Constitution, and that the district court erred in ruling to the contrary. Because plaintiffs do not seek to increase their rights under the judgment by asserting this claim, we have

---

**11.** Even were we to regard a small (less than two percent) percentage of funding for the CSP as coming from the public school fund, we would regard that money as within the twenty-five percent of per pupil revenue retained by the District to administer the program.

jurisdiction to consider it notwithstanding that plaintiffs did not file a cross-appeal. *See* Part II.A.2, *supra*. Their contention fails.

¶ 57 As noted, article IX, section 15 provides that the directors of the boards of education of local school districts "shall have control of instruction in the public schools of their respective districts." The district court found that this provision is aimed at ensuring that the state does not encroach upon the prerogative of local school districts to control the instruction in the public schools within their respective districts.

¶ 58 We agree with the district court. *See Owens*, 92 P.3d at 935, 938–42 (discussing the purpose of article IX, section 15 and cases applying it). Further, the provision does not relate to instruction in private schools. As discussed above, participating private schools retain their character as private, not public, schools. It follows that article IX, section 15 does not apply to the CSP.

### B. Religion Claims

¶ 59 The Colorado Constitution contains a number of provisions addressing the relationship between state government and citizens, on the one hand, and religion generally and religious institutions, on the other hand. Some of these provisions pertain to support for religion and religious institutions. Four are at issue here: article II, section 4; article V, section 34;[12] and article IX, sections 7 and 8.

¶ 60 Defendants urge us to hold that these provisions are substantively indistinguishable from the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution. Were we to do so, they contend, we would have no choice but to reject plaintiffs' claims under the state constitution because the United States Supreme Court rejected a First Amendment challenge to a virtually identical school choice program

in *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002).

¶ 61 No Colorado appellate decision has held that the Colorado Constitution's religion provisions are merely coextensive with the Religion Clauses of the First Amendment. We will not consider that issue because we need not do so to resolve the merits of plaintiffs' claims under existing jurisprudence. *See People v. Thompson*, 181 P.3d 1143, 1145 (Colo.2008) ("[W]e will refrain from resolving constitutional questions or from making determinations regarding the extent of constitutional rights 'unless such a determination is essential and the necessity of such a decision is clear and inescapable.' ") (quoting in part *Denver Publ'g Co. v. Bd. of Cnty. Comm'rs*, 121 P.3d 190, 194 (Colo. 2005)); *Ricci v. Davis*, 627 P.2d 1111, 1121 (Colo.1981) ("[A] court will not rule on a constitutional question which is not essential to the resolution of the controversy before it.").

¶ 62 For the same reason, we will not address defendants' contention that we should disregard some of the religion provisions at issue (article V, section 34; and article IX, sections 7 and 8) because many of those who proposed and voted for them were motivated by anti-Catholic bigotry. According to defendants (and certain amici curiae), these provisions—which they term "Blaine provisions"[13]—are unconstitutional under the federal constitution because of their alleged discriminatory purpose. But again, we need not consider that issue because we conclude that the CSP does not violate any of the subject provisions.

#### 1. Article II, § 4—Required Attendance or Support

■ ¶ 63 As relevant here, article II, section 4 provides: "No person shall be required

---

12. We discuss this provision in Part II. C below.

13. This term has come to be used to identify state laws and constitutional provisions which allegedly arose out of anti-Catholic school sentiment. In 1875, Congressman James G. Blaine proposed an amendment to the United States Constitution that, in part, would have prohibited disbursement of public funds to parochial schools. It was approved by the House of Representatives, but not by the Senate. Similar prohibitions were

adopted in many states, however. *See generally* Mark Edward DeForrest, *An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns*, 26 Harv. J.L. & Pub. Pol'y 551, 556–76 (2003); Joseph P. Viteritti, *Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law*, 21 Harv. J.L. & Pub. Pol'y 657, 670–75 (1998); Steven K. Green, *The Blaine Amendment Reconsidered*, 36 Am. J. Legal Hist. 38 (1992).

to attend or support any ministry or place of worship, religious sect or denomination against his consent." The district court ruled that the CSP violates this prohibition because schools affiliated with religious institutions would receive taxpayer money, and taxpayers would thereby be compelled to support "indoctrination and religious education" at such schools. We disagree.

¶ 64 In *Americans United for Separation of Church and State Fund, Inc. v. State*, 648 P.2d 1072 (Colo.1982), the court rejected a challenge to a program similar to the CSP under the compelled support provision of article II, section 4. That program provides monetary grants of state funds to Colorado resident students attending private institutions of higher education in the state. As then devised, the program provided aid to students attending "sectarian" schools, but not to students attending "pervasively sectarian" schools. *See* Ch. 279, §§ 23–3.5–101 to – 106, 1977 Colo. Sess. Laws 1104–06.

¶ 65 The court began its analysis by recognizing that article II, section 4 "echoes the principle of constitutional neutrality underscoring the First Amendment." *Americans United*, 648 P.2d at 1082.[14] It then observed that the compelled attendance or support clause " 'is aimed to prevent an established church.' " *Id.* (quoting *People in Interest of Vollmar v. Stanley*, 81 Colo. 276, 285, 255 P. 610, 615 (1927)).

¶ 66 In upholding the grant program, the court found that it was "designed for the benefit of the student, not the educational institution," and was neutral in the sense that it was "available to students at both public and private institutions of higher learning." *Id.*

¶ 67 Essentially the same can be said of the CSP. The district court found, with record support, that "the purpose of the [CSP] is to aid students and parents, not sectarian institutions." And the CSP is neutral—it is available to all District students and to any private school which meets the neutral eligibility criteria.

¶ 68 The district court, however, determined that the program at issue in *Americans United* is materially distinguishable from the CSP because the CSP does not include "any express language that limits or conditions the use of state funds received by the partner schools for the strict purpose of secular student education." And after extensively scrutinizing the nature of the education provided by certain participating private schools and the degree to which those schools "infuse religious teachings into the curriculum," the court concluded that taxpayer money ultimately would be used to further sectarian institutions' "goals of indoctrination and religious education."[15]

¶ 69 The district court erred in its analysis, for two reasons. First, contrary to the district court's conclusion, the program at issue in Americans United "does not expressly limit the purpose for which the institutions may spend the funds distributed under the grant program...." *Id.* at 1084. Rather, the supreme court observed that the program provides for a "biannual audit and review of payment procedures and other practices ... [that] are expressly designed to insure that the grant program is being properly administered," and prohibits participating institutions from "decreas[ing] the amount of its own funds spent for student aid below the amount spent prior to participation in the program." *Id.*

¶ 70 In these respects, the program at issue in *Americans United* is analogous to the CSP. As the district court found, the CSP has a "check and balance system" which allows for periodic District review of participating private schools' records to assure that

---

14. The court did not, however, go so far as to equate article II, section 4 with the Religion Clauses of the First Amendment. *See* 648 P.2d at 1078 (noting that First Amendment jurisprudence "is not necessarily determinative of state constitutional claims"); *see also Conrad v. City & Cnty. of Denver*, 656 P.2d 662, 667 (Colo.1982).

15. At one point in its written order, the district court said that it would not "analyze the religiousness of a particular institution." (The court said this because of a concern that doing so would be impermissible under the First Amendment, a concern that was well-founded. *See* discussion below.) But the court proceeded to do precisely that, discussing at length the religious aspects of certain participating private schools' educational programs and then relying on the results of that inquiry in striking down the CSP.

the schools are complying with the educational and other requirements to which they agreed. And the District's Assistant Superintendent testified that any school which would reduce its financial aid to a participating student because of participation in the CSP would be in violation of the CSP. Though the district court found that one such instance of aid reduction had occurred (out of hundreds of participating students), the court cited no evidence supporting a conclusion that such reduction was permissible under the CSP. Plaintiffs have not cited any such record evidence either.

¶ 71 Second, the inquiry in which the district court engaged—into the degree to which religious tenets and beliefs are included in participating private schools' educational programs—is no longer constitutionally permissible. In the thirty years since *Americans United* was decided, the United States Supreme Court has made clear that, in assessing facially neutral student aid laws, a court may not inquire into the extent to which religious teaching pervades a particular institution's curriculum. Doing so violates the First Amendment. *See Mitchell v. Helms,* 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality op.); *id.* at 837–67, 120 S.Ct. 2530 (O'Connor, J., concurring, joined by Breyer, J.) (declining to engage in pervasiveness inquiry); *see also Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 867, 876–77, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (rejecting the assertion that a public university could refuse benefits of a neutral subsidy to student publications that contained "indoctrination" and "evangelis[m]," as opposed to "descriptive examination of religious doctrine"); *Witters v. Washington Dep't of Services for Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (provision of financial assistance under vocational rehabilitation program to blind person who chose to attend a Christian college to study ministry did not violate the First Amendment; program was neutral in that it allowed students to use aid to attend public or sectarian schools of their choice).

¶ 72 In *Colorado Christian University v. Weaver,* 534 F.3d 1245 (10th Cir.2008), the Tenth Circuit Court of Appeals addressed the program addressed twenty-six years earlier by the supreme court in *Americans United.* It held that by providing financial aid to students attending sectarian institutions of higher education, but not to students attending "pervasively sectarian" institutions of higher education, the program unconstitutionally discriminated among and within religions. The court based its holding on the conclusion that Supreme Court jurisprudence now holds that inquiry into the pervasiveness of an institution's religious beliefs (including the likelihood of "indoctrination") violates the constitutional requirement of neutrality toward religion embodied in the Establishment and Free Exercise Clauses. *Id.* at 1257–66. Simply put, a government may not choose among eligible institutions "on the basis of intrusive judgments regarding contested questions of religious belief or practice." *Id.* at 1261; accord *Mitchell,* 530 U.S. at 828, 120 S.Ct. 2530 (plurality op.); see *Univ. of Great Falls v. N.L.R.B.,* 278 F.3d 1335 (D.C.Cir. 2002) (in determining whether university was subject to agency's jurisdiction, agency could not inquire into the university's "substantial religious character"); *Columbia Union College v. Oliver,* 254 F.3d 496, 501–06 (4th Cir.2001) (private college affiliated with a religious denomination could not be excluded from state grant program on the basis the college was pervasively sectarian; such inquiry is impermissible under the First Amendment).[16]

¶ 73 Our colleague in dissent says that *Colorado Christian University* is not applicable here because the program at issue there distinguished between sectarian and pervasively sectarian schools. But the principle the court applied in that case, based on current Supreme Court jurisprudence, is that if the state chooses "among otherwise eligible institutions, it must employ neutral, objective criteria rather than criteria that involve the evaluation of contested religious questions and practices." *Colorado Christian Univ.,*

---

**16.** In response to the court's decision in *Colorado Christian University,* the General Assembly removed all pervasiveness provisions and references from the program. *See* Ch. 348, secs. 1, 2, 4, 12, 2009 Colo. Sess. Laws 1822–24, 1827. Thus, any distinction between private schools not affiliated with a religious institution and private schools that are has been eliminated.

534 F.3d at 1266. Such intrusive judgments are impermissible under the First Amendment. *See also id.* at 1261.[17] We think this principle applies with equal force where the program at issue is facially neutral toward private religious schools because it is open to all private schools. *See id.* at 1255 (reading *Locke v. Davey,* 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), as suggesting, though not holding, that "the State's latitude to discriminate against religion ... does not extend to the wholesale exclusion of religious institutions and their students from otherwise neutral and generally available government support").[18] Indeed, the program at issue in *Mitchell* (which pertained to elementary and secondary schools) was such a program.

¶ 74 Here, the CSP is neutral toward religion generally and toward religion-affiliated schools specifically. The district court nonetheless found the CSP unconstitutional under article II, section 4 based on an inquiry into the degree to which certain schools "infuse religious teachings into [their] curriculum" and intend to "indoctrinat[e]" students, precisely the type of inquiry forbidden by the First Amendment. We do not interpret article II, section 4 to require, or even allow, this type of inquiry.[19]

¶ 75 Further, we reject the district court's analysis insofar as it perceived a distinction between elementary and secondary schools and institutions of higher education. The

inappropriateness of the inquiry into the extent to which a school teaches religious doctrine is based on the First Amendment's requirement of neutrality. That principle does not evaporate because the school in question is an elementary or secondary school. Indeed, the schools at issue in *Mitchell* were elementary and secondary schools.

¶ 76 In concluding that the grant program before it did not violate the compelled support prohibition of article II, section 4, the supreme court in *Americans United* summed up its reasoning as follows:

> [The program] holds out no threat to the autonomy of free religious choice and poses no risk of governmental control of churches. Being essentially neutral in character, it advances no religious cause and exacts no form of support for religious institutions. Nor does it bestow preferential treatment to religion in general or to any denomination in particular. Finally, there is no risk of governmental entanglement to any constitutionally significant degree.

*Americans United,* 648 P.2d at 1082. The same can be said of the CSP. Therefore, it does not violate the compelled support prohibition of article II, section 4. *Cf. Simmons–Harris,* 711 N.E.2d at 211–12 (similar school choice program did not violate Ohio Constitution's compelled support prohibition).

---

**17.** We do not hold, of course, that any of the provisions of the Colorado Constitution here at issue violate the Religion Clauses of the First Amendment. We do hold that they must be applied in a way that does not violate the Religion Clauses. *See Colo. Right to Life Comm., Inc. v. Coffman,* 498 F.3d 1137, 1146 (10th Cir.2007); *Alliance for Colorado's Families v. Gilbert,* 172 P.3d 964, 968 (Colo.App.2007).

**18.** The dissent asserts that *Locke* supports its position that the CSP violates article IX, section 7, a provision discussed below that is similar to article IX, section 4. *Locke,* however, held only that the state was not required to include the study of "devotional theology" within a program awarding college scholarships. It did not hold that the state was required to exclude that field of study from the program. (And the program at issue in *Locke* provided scholarships for, apparently, all other fields of study at schools affiliated with religious institutions. *Locke,* 540 U.S. at 724–25 & n. 9, 124 S.Ct. 1307.)

**19.** We recognize that the court in *Americans United* may have considered the statutory provisions distinguishing between eligible sectarian schools and ineligible "pervasively sectarian" schools as relevant to the analysis under article II, section 4. But where subsequent developments in Supreme Court jurisprudence render a prior Colorado Supreme Court decision applying state law inconsistent with the federal constitution, we are not required to follow that prior decision. *Cf. People v. Hopper,* 284 P.3d 87, 90 & n. 3 (Colo.App.2011) (noting that subsequent Supreme Court decision had effectively overruled prior state supreme court decision). We also note that it would be paradoxical to hold that a decision (such as *Colorado Christian University* ) striking portions of a state law as unconstitutional under the federal constitution rendered the law unconstitutional under analogous provisions of the state constitution.

¶ 77 Nor are we persuaded by plaintiffs' argument that the CSP violates the compelled attendance prohibition of article II, section 4 because some participating private schools require students to attend religious services.[20] Assuming that is the case, and assuming that the district court correctly determined that the CSP's "opt out" provision is "illusory," the fact remains that the CSP does not compel anyone to do anything, much less attend religious services. No student is compelled to participate in the CSP or, having been accepted to participate, to attend any particular participating private school. To the extent students would attend religious services, they would do so as a result of parents' voluntary choices. Article II, section 4 clearly does not proscribe such choices.[21]

### 2. Article IX, § 7—No Aid to Religious Organizations

¶ 78 Article IX, section 7 provides in relevant part:

> Neither the general assembly, nor any county, city, town, township, school district or other public corporation, shall ever make any appropriation, or pay from any public fund or moneys whatever, anything in aid of any church or sectarian society, or for any sectarian purpose, or to help support or sustain any school, academy, seminary, college, university or other literary or scientific institution, controlled by any church or sectarian denomination whatsoever....

¶ 79 The district court ruled that the CSP violates this provision essentially for the same reasons it found a violation of article II, section 4. And essentially for the same reasons we have concluded that the CSP does not violate article II, section 4, we conclude that it does not violate article IX, section 7.[22]

¶ 80 In *Americans United*, the supreme court also rejected a challenge to the higher education grant program under article IX, section 7. The court considered a number of things: (1) the aid is intended to assist the student and any benefit to the institution is incidental; (2) the aid is available only to students attending institutions of higher education, where "there is less risk of religion intruding into the secular educational function of the institution than there is at the level of parochial elementary and secondary education"; (3) the aid is available to students attending both public and private institutions; and (4) the criteria for institutional eligibility require a strong commitment to academic freedom. *Americans United*, 648 P.2d at 1083–84.

¶ 81 As previously discussed, the CSP, like the program at issue in *Americans United*, is intended to benefit students and their parents, and any benefit to the participating schools is incidental. "Such a remote and incidental benefit does not constitute ... aid to the institution itself within the meaning of Article IX, Section 7." *Id.*; *cf. Zelman*, 536 U.S. at 652, 122 S.Ct. 2460 (holding that school choice program substantially similar to the CSP did not violate the First Amendment because any advancement of religion was only incidental and was attributable to the individual aid recipients, not the government). And although the aid here is not available to students attending public schools (because attendance at public schools is free), it is available to students attending private schools without any religious affiliation. The CSP is neutral toward religion, and funds make their way to private schools with religious affiliation by means of personal choices of students' parents.

---

20. The district court did not rule on this issue.

21. Amicus Curiae Anti–Defamation League contend that the CSP violates the Colorado Constitution, including, apparently, article II, section 4, and state anti-discrimination laws because some participating private schools allegedly discriminate in admissions and hiring on the basis of religious belief, sexual orientation, and disability. Plaintiffs did not make this claim in the district court, and therefore amicus curiae cannot raise it on appeal. *Gorman v. Tucker*, 961 P.2d 1126, 1131 (Colo.1998); *D.R. Horton, Inc.–Denver v.*

*Bischof & Coffman Constr., LLC*, 217 P.3d 1262, 1267 (Colo.App.2009). But we observe that the premise of this argument—that participating private schools are public schools—is incorrect.

22. Contrary to the dissent's suggestion, we do not hold that the limitations of article IX, section 7 are merely coextensive with those of the Religion Clauses of the First Amendment. Article IX, section 7 may well prohibit types of funding that the First Amendment does not. But, as noted above, we need not decide that question.

¶ 82 Consideration of the other matters considered by the court in *Americans United* is problematic here because those matters involve an inquiry into the extent to which the participating private schools are "sectarian." Such an inquiry is, in our view, foreclosed by the First Amendment's Religion Clauses, as fully discussed above.

¶ 83 But, in any event, we are not persuaded by the dissent's assertion that the distinction between institutions of higher education (colleges and universities) and elementary and secondary schools was crucial to the court's holding. As noted, in *Americans United* the court held that because the program was intended to benefit parents and their children, any indirect benefit to the schools was not "in aid of" any religious organization. *Americans United*, 648 P.2d at 1083–84. This principle holds true regardless of the nature of the school—in all events the aid is incidental and therefore not in violation of article IX, section 7.

¶ 84 And we note that nothing in the text of article IX, section 7 even remotely hints at the distinction on which the dissent relies.

¶ 85 As relevant here, the provision prohibits "anything in aid of any church or sectarian society" or "anything ... to help support or sustain any school ... controlled by any church or sectarian denomination...." Logically, because the provision is not limited to support of the religious mission of any religious institution, inquiry into the extent of religious instruction at a particular school would appear to be irrelevant.

¶ 86 We also observe that the CSP, like the program at issue in *Americans United*, includes eligibility criteria designed to assure that participating private schools' educational programs "produce[ ] student achievement and growth results for [participating students] at least as strong as what District neighborhood and charter schools produce." And the CSP provides for regular District oversight to assure that participating private schools are meeting the secular requirements of the program.

¶ 87 Thus, even if we assume that consideration of all the facts discussed in *Americans United* remains constitutionally permissible, we conclude that our holding is consistent with *Americans United*.[23]

¶ 88 We are unpersuaded by the out-of-state cases on which the dissent relies, *Cain v. Horne*, 220 Ariz. 77, 202 P.3d 1178 (2009); *Bush v. Holmes*, 886 So.2d 340 (Fla.Dist.Ct. App.2004), *aff'd on other grounds*, 919 So.2d 392 (Fla.2006); and *Witters v. State Commission for the Blind*, 112 Wash.2d 363, 771 P.2d 1119 (1989).[24] In *Cain*, for example, the court based its holding on the conclusion that the fact money was transferred to parents, who had chosen the private schools their children would attend, was irrelevant. *Cain*, 202 P.3d at 1184. That reasoning, which is typical of the reasoning in the cases on which the dissent relies, is flatly at odds with our supreme court's reasoning in *Americans United*, in which the court deemed the neutral character of the grant programs as essentially determinative.[25]

¶ 89 Having considered "the entire statutory scheme measured against the constitutional proscription," 648 P.2d at 1083, we conclude that the CSP does not violate article IX, section 7.

### 3. Article IX, § 8—Religion in Public Schools

¶ 90 Article IX, section 8 provides in relevant part:

> language of article IX, section 7 requires invalidation of the CSP would require us also to say that *Americans United* was wrongly decided. According to the dissent, the plain language of the provision dictates that whenever state money makes its way to a private school affiliated with a religious institution, the provision is violated. *Americans United* unequivocally held to the contrary. The purpose of the aid and the identity of the person or entity choosing the school make all the difference in determining whether money is "in aid of" such an institution.

**23.** Our analysis in this regard also applies to plaintiffs' claim under article IX, section 4.

**24.** *Univ. of Cumberlands v. Pennybacker*, 308 S.W.3d 668 (Ky.2010), another case on which the dissent relies, is entirely inapposite. That case did not concern a facially neutral program like the CSP. Rather, it concerned a bill directly appropriating state money to build a pharmacy school building on the campus of a particular college affiliated with a religious institution. *Id.* at 671.

**25.** This leads us to observe that to accept the dissent's view that the "clear and unambiguous"

No religious test or qualification shall ever be required of any person as a condition of admission into any public educational institution of the state, either as a teacher or student; and no teacher or student of any such institution shall ever be required to attend or participate in any religious service whatsoever. No sectarian tenets or doctrines shall ever be taught in the public school ....

¶ 91 Although this provision plainly applies to "public educational institution[s]" and "public school[s]," the district court reasoned that it applies to the CSP because participating students would be enrolled in the Charter School. It then concluded that participating private schools' admissions criteria (which in some cases include religious qualifications) and requirements of attendance at religious services and religious instruction could be imputed to the Charter School. Thus, the district court found that the CSP impermissibly imposes religious tests for admission to public institutions of the state, requires students of such institutions to attend religious services, and allows sectarian tenets or doctrines to be taught in public schools. We disagree with the district court's reasoning.

¶ 92 The district court failed sufficiently to account for the fact that attendance at any of the participating private schools is not required by the CSP; such attendance is by parental choice. Moreover, as discussed above, participation in the CSP does not transform private schools into public schools.

¶ 93 Nor does the fact students would be enrolled in the Charter School for administrative purposes justify imputing requirements of the participating private schools to the Charter School. The reality is that, for educational purposes, participating students would be enrolled in the participating private schools, as to which article IX, section 8 has no application by its express terms.[26]

¶ 94 Therefore, we conclude that the CSP does not violate article IX, Section 8.

### C. Article V, § 34—Prohibited Appropriations

¶ 95 Article V, section 34 provides: "No appropriation shall be made for ... educational ... purposes to any person, corporation or community not under the absolute control of the state, nor to any denominational or sectarian institution or association." The district court found that the CSP violates this provision in two ways. First, because "payment of state funds is made directly to the" participating private schools, appropriations are thereby made to entities not under absolute state control. And second, for the same reason, appropriations are made to religious organizations. The district court misconstrued the provision.

¶ 96 Article V, section 34 is part of article V of the Colorado Constitution, which deals with the structure and powers of the General Assembly. See, e.g., art. V, § 1(1). Article V includes two provisions dealing with appropriations, sections 32 and 34. The appropriations encompassed by those sections clearly are appropriations by the General Assembly itself. Colo. Gen. Assembly v. Lamm, 700 P.2d 508, 519 (Colo.1985) ("the power of the General Assembly over appropriations is absolute"); Lyman v. Town of Bow Mar, 188 Colo. 216, 227, 533 P.2d 1129, 1136 (1975) (article V, section 34 "refers only to state funds and does not extend to municipalities"); Williamson v. Bd. of Comm'rs (In re House), 23 Colo. 87, 91, 46 P. 117, 118 (1896) (article V "had in contemplation the disbursement of state funds only, and their disposition by the state in its corporate capacity ...").

¶ 97 No such disbursement would occur under the CSP. The General Assembly appropriates state money for elementary and secondary education to the Colorado Department of Education, which in turn distributes it to local school districts in the form of total per pupil revenue. At that point, ownership of the funds passes to the local school districts. Craig, 89 Colo. at 144–45, 299 P. at 1066; see § 22-54-104(1)(a). The District's

---

**26.** Defendants argue that the first two sentences of article IX, section 8 do not apply to public elementary and secondary schools, but only to institutions of higher education. We do not need to resolve that issue, however, because even if we assume that the first two sentences apply to elementary and secondary schools, we perceive no violation.

expenditure of funds under the CSP, therefore, does not constitute an appropriation by the General Assembly.

¶ 98 Further, in *Americans United*, the supreme court held that the grant program there at issue does not violate the prohibition of article V, section 34 barring appropriations from being made to entities not under absolute state control because (1) the aid is designed to assist the students, not the institutions, and therefore any benefit to the institutions is incidental; and (2) the aid serves a discrete and particularized public purpose, namely, to provide assistance to Colorado resident students attending institutions of higher education, which predominates over any individual interest incidentally served by the program. *Americans United*, 648 P.2d at 1074, 1083–86. The CSP survives scrutiny under article V, section 34 for similar reasons.

¶ 99 The district court found that "the purpose of the [CSP] is to aid students and parents, not sectarian institutions." Any benefit to the participating private school is incidental, occasioned by the individual choices of students' parents. *Cf. Simmons–Harris*, 711 N.E.2d at 212 (holding that similar school choice program did not violate constitutional prohibition on use of state school funds because schools receive money "only as the result of independent decisions of parents and students").

¶ 100 And the CSP serves discrete and particularized public purposes. Indeed, it has three such purposes, "to provide greater educational choice for students and parents to meet individualized student needs, improve educational performance through competition, and obtain a high return on investment of [District] educational spending." We perceive no principled distinction between these purposes and that found sufficient in *Americans United*.

¶ 101 The district court sought to distinguish *Americans United* on the grounds that, unlike the program at issue in *Americans United*, the CSP does not have "any of

the prophylactic measures" to assure that religion would not intrude on the secular education function. For the reasons discussed above, that purported distinction is untenable.

¶ 102 As for the prohibition against appropriations to religious organizations, we perceive no basis for applying a different analysis to that prohibition than that applied to the prohibition against appropriations to entities not under absolute state control.[27]

¶ 103 Therefore, we conclude that the CSP does not violate article V, section 34.

### III. Briefs of Amici Curiae

¶ 104 We have received a number of briefs of amici curiae supporting and opposing the district court's judgment. Some amici curia raise contentions based on constitutional and statutory provisions that were not raised by plaintiffs. That is not the proper role of amici curiae. *See Gorman*, 961 P.2d at 1131; *SZL, Inc. v. Indus. Claim Appeals Office*, 254 P.3d 1180, 1189 (Colo.App.2011); *D.R. Horton*, 217 P.3d at 1267.

¶ 105 Some amici curiae urge us to affirm or reverse the district court's judgment purely for policy reasons, without regard for the governing law. Because making decisions based on such reasons is not part of the courts' constitutional function, these arguments are improper. Such arguments should be directed to the appropriate law-making bodies. *See Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo. 2000) ("[C]ourts must avoid making decisions that are intrinsically legislative. It is not up to the court to make policy or to weigh policy.").

### IV. Conclusion

¶ 106 Plaintiffs failed to carry their burden of proving the unconstitutionality of the CSP beyond a reasonable doubt, or by any other potentially applicable standard. None of them have standing to assert a claim under

27. In *Cain*, 202 P.3d 1178, the Arizona Supreme Court held that two school choice programs violated two provisions of the Arizona Constitution prohibiting appropriations to religious establishments and private or sectarian schools. But those programs, unlike the CSP, were funded by direct appropriations by the state legislature. And, as discussed above, we do not see how the court's analysis in that case can be squared with *Americans United*.

the Act. Accordingly, the district court's judgment cannot stand.

¶ 107 The judgment is reversed, and the case is remanded to the district court for entry of judgment in defendants' favor.

JUDGE GRAHAM concurs.

JUDGE BERNARD dissents.

JUDGE BERNARD dissenting.

¶ 108 This difficult case springs from an important public responsibility—educating children—and from thorny questions surrounding the mechanisms that can be employed to fund that responsibility. What those funding mechanisms should be and how they should be maintained are questions that should, in most circumstances, be answered by local school boards.

¶ 109 But this case involves an exception to that general rule. One of the circumstances that cannot be finally resolved by a local school board is whether a particular funding mechanism that it has chosen violates the federal or state constitution.

¶ 110 Colorado Constitution article IX, section 7 (section 7) is far more detailed and focused on the issues in this case than is the language of the First Amendment. Section 7's language is unambiguous. In my view, it prohibits public school districts from channeling public money to private religious schools.

¶ 111 I think that the Choice Scholarship Program is a pipeline that violates this direct and clear constitutional command. I would follow this command, and I would conclude that section 7

· establishes greater protection against the establishment of religion in Colorado's public elementary; middle, and high schools than does the First Amendment's Establishment Clause;

· does not offend the Establishment Clause, the First Amendment's Free Exercise Clause, or the Fourteenth Amendment's Equal Protection Clause;

· bars transferring public funds to private religious elementary, middle, and high schools; and

· renders the Choice Scholarship Program, created by Douglas County School District RE–1, unconstitutional.

¶ 112 Because I would reach these conclusions, I respectfully dissent from the majority's resolution of this case. I would, instead, affirm the district court's decision to permanently enjoin the scholarship program.

¶ 113 Although I dissent, I do not impute any improper bias or sinister motive to the local school board. The trial court found that the purpose of the scholarship program was a "well-intentioned effort to assist students ... not sectarian institutions." But the fact that the school board acted with a good heart does not mean that it can choose a solution to the admittedly complex and vexing problems surrounding educating children that violates Colorado's Constitution.

### I. Principles Used to Interpret Constitutional Sections

Our state "constitution derives its force .... from the people who ratified it, and their understanding of it must control. This is to be arrived at by construing the language[ ] used in the instrument according to the sense most obvious to the common understanding."

*People v. Rodriguez,* 112 P.3d 693, 696 (Colo. 2005) (quoting *Alexander v. People,* 7 Colo. 155, 167, 2 P. 894, 900 (1884)).

¶ 114 We give the language of our constitution its "ordinary and common meaning" in order to give "effect to every word and term contained therein, whenever possible." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Vail Assocs., Inc.,* 19 P.3d 1263, 1273 (Colo.2001)). If the language "is plain, its meaning clear, and no absurdity involved, constitutional provisions must be declared and enforced as written." *Id.* (quoting *In re Great Outdoors Colo. Trust Fund,* 913 P.2d 533, 538 (Colo. 1996)). "[I]n doing so, technical rules of construction should not be applied so as to defeat the objectives sought to be accomplished by the provision under consideration." *Id.* (quoting *Cooper Motors v. Bd. of Cnty. Comm'rs,* 131 Colo. 78, 83, 279 P.2d 685, 688 (1955)).

¶ 115 If it seems that a section of the Colorado Constitution *implies* limitations on rights or on the legislature's authority, "it becomes highly important to ascertain, if that may be done, what the framers of the Consti-

tution really had in mind, and actually intended to cover, by the enactment of this provision." *Schwartz v. People*, 46 Colo. 239, 257, 104 P. 92, 98 (1909). To do so, we read the record of the constitutional convention's proceedings and look to "the attitude of the members of that body, as shown by the record concerning the then[-]existing laws on that subject." *Id.*

¶ 116 "Where the analogous federal and state constitutional provisions are textually identical, we have always viewed cases interpreting the federal constitutional provision as persuasive authority." *People v. Dunaway*, 88 P.3d 619, 630 (Colo.2004). However, such decisions do not bind us. *See High Gear & Toke Shop v. Beacom*, 689 P.2d 624, 628 n. 1 (Colo.1984) (Tenth Circuit's interpretation of Colorado statute was not binding on Colorado Supreme Court).

¶ 117 Our supreme court has interpreted sections of the Colorado Constitution differently than the United States Supreme Court has interpreted similarly worded sections of the federal constitution. For example, our supreme court's holding that a person has a reasonable expectation of privacy in the telephone numbers that he or she dials, which is based on Colorado Constitution article II, section 7, is more restrictive than the federal rule, which is based on the Fourth Amendment. *Compare Smith v. Maryland*, 442 U.S. 735, 742–45, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), *with People v. Sporleder*, 666 P.2d 135, 140–42 (Colo.1983). Colorado's rule, which is based on Colorado Constitution article II, section 18, barring retrial after an appellate court reverses a trial court's order of dismissal before a verdict has been rendered, is stricter than the federal rule, which is based on the Fifth Amendment's Double Jeopardy Clause. *Compare United States v. Scott*, 437 U.S. 82, 98–99, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), *with Krutka v. Spinuzzi*, 153 Colo. 115, 124–27, 384 P.2d 928, 933–35 (1963).

¶ 118 Another example involves speech. The protections found in the First Amendment apply to the states. *Curious Theatre Co. v. Colorado Dep't of Public Health & Environment*, 220 P.3d 544, 551 (Colo.2009). These protections trump conflicting state constitutional sections. *Id.* However, "the First Amendment limits the power of the federal and state governments to abridge individual freedoms, not the power of states to even further restrict governmental impairment of those individual freedoms." *Id.* The United States Supreme Court has "acknowledged each State's 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.'" *Bock v. Westminster Mall Co.*, 819 P.2d 55, 59 (Colo.1991) (quoting *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)). Thus, the First Amendment sets the constitutional minimum level of protection that states must provide, but "a state may, if it so chooses, afford its residents a greater level of protection under its state constitution than that bestowed by the Federal Constitution." *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1053–54 (Colo.2002).

¶ 119 When interpreting Colorado Constitution, article II, section 10, which addresses free speech, our supreme court has repeatedly held that this Colorado constitutional section "provides broader free speech protections than the Federal Constitution." *Id.* at 1054 & n. 18 (collecting cases). Such conclusions have been based on "differences between the language of the First Amendment ... and the language of the Colorado Constitution" and Colorado's "extensive history of affording broader protection under the Colorado Constitution for expressive rights." *Id.* at 1054.

¶ 120 However, it is fundamentally important to keep in mind that those courts that

fail to explain important divergences from precedent run the risk of being accused of making policy decisions based on subjective result-oriented reasons....

[C]ourts should be hesitant in interpreting identical language in state constitutions differently in their efforts to reach conclusions which differ from the United States Supreme Court. Principled differences between the state and federal constitutions are a necessary and important aspect of our system of federalism. Differences exist and should be applied when appropriate.

*Sporleder*, 666 P.2d at 149–50 (Erickson, J., dissenting); see also *People v. Timmons*, 690 P.2d 213, 218 (Colo.1984) (Erickson, C.J., dissenting) ("[W]hen provisions of the Colorado Constitution closely parallel the federal constitution, or in areas in which state rules or statutes are enacted pursuant to or closely dovetail federal acts or policies, the decisions of the United States Supreme Court should be approached with deference.... A state court should attempt to carefully set forth reasons why it believes that state law or policy leads to a different result.").

¶ 121 But, as I explain in some detail below, (1) the language in section 7 is much different from the language of the First Amendment, and, thus, those two constitutional sections are not closely parallel, *see Tattered Cover, Inc.*, 44 P.3d at 1054; (2) prior decisions of the United States Supreme Court and the Colorado Supreme Court have not eliminated those differences as far as the facts of this case are concerned; (3) there are principled differences between the First Amendment and section 7, and recognizing them here is appropriate; and (4) applying section 7 to this case does not violate the Free Exercise, Establishment, or Equal Protection Clauses.

## II. Analysis of the Text of the First Amendment and Section 7

### A. The Text

¶ 122 The Colorado Constitution creates an obligation that does not appear anywhere in the United States Constitution. Colorado Constitution article IX, section 2, states:

> The general assembly shall ... provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously.

*See Cary v. Board of Educ.*, 598 F.2d 535, 543 (10th Cir.1979) ("[T]he Supreme Court has ruled there is no constitutional right to an education. Whether there is a public education system is left to the states." (citation omitted) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973))).

¶ 123 The United States Constitution does not address the creation of any schools, let alone a "uniform system of free public schools." More specifically, there is no discussion of the duty to create such a system, or what its parameters should be, or what limitations should be placed upon it, in the First Amendment. The First Amendment simply states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."

¶ 124 As a result, the United States Constitution does not expressly address the situation that we face here: the intersection of public education, public tax dollars, and private religious schools. However, in my view, the Colorado Constitution specifically addresses that intersection.

¶ 125 Section 7, which is entitled "Aid to private schools, churches, sectarian purpose, forbidden," states:

> Neither the general assembly, nor any ... school district ..., shall ever make any appropriation, or pay from any public fund or moneys whatever, anything in aid of any church or sectarian society, or for any sectarian purpose, or to help support or sustain any school, academy, seminary, college, university or other literary or scientific institution, controlled by any church or sectarian denomination whatsoever; nor shall any grant or donation of land, money or other personal property, ever be made by the state ... to any church, or for any sectarian purpose.

### B. Interpretation of the Text

¶ 126 Giving the language of this section its ordinary and common meaning, and giving effect to every word in it, *see Rodriguez*, 112 P.3d at 696, I would conclude that this language is clear and unambiguous. I would further conclude that, because the language is plain, its meaning is clear, and there is no absurdity involved, this constitutional section must be "declared and enforced as written." *See id.* I would not employ technical rules of construction to defeat the clearly stated objectives found in this section, *see id.* and, because the language is so clear, I do not think it "implies" limitations on the school

district's authority, *see Schwartz*, 46 Colo. at 257, 104 P. at 98.

¶ 127 Rather, those limitations are, in my view, patent. Under section 7, school districts cannot *"ever* make *any* appropriation" or "pay from *any* public fund or moneys *whatever, anything* " to "help support or sustain" elementary, middle, or high schools that are "controlled by *any* church or sectarian denomination *whatsoever.*" (Emphases supplied.)

¶ 128 Courts in other states have interpreted similar sections in their state constitutions to reach a similar result. In *Witters v. State Comm'n for the Blind*, 112 Wash.2d 363, 368–70, 771 P.2d 1119, 1121–22 (1989), the Washington Supreme Court considered a section in the Washington Constitution that stated that "[n]o public money ... shall be ... applied to any religious ... instruction." Wash. Const. art. 1, § 11. Relying on that section, the court held that a state commission properly denied a student's request that the state "pay for a religious course of study at a religious school, with a religious career as his goal." 112 Wash.2d at 368, 771 P.2d at 1121.

¶ 129 In *Bush v. Holmes*, 886 So.2d 340, 347–61 (Fla.Dist.Ct.App.2004), *aff'd on other grounds*, 919 So.2d 392 (Fla.2006), the Florida District Court of Appeal evaluated a section of the Florida Constitution that stated that the revenue of the state or of political subdivisions of the state could not be used "directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution." Fla. Const. art. I, § 3. The court held that a state scholarship program that provided vouchers for students to attend religious schools violated this section.

¶ 130 In *Cain v. Horne*, 220 Ariz. 77, 83, 202 P.3d 1178, 1185 (2009), the Arizona Supreme Court examined a section in the Arizona Constitution that stated that "[n]o ... appropriation of public money [shall be] made in aid of any ... private or sectarian school." Ariz. Const. art. IX, § 10. The court concluded that a proposed voucher program that would have provided funds for students to attend religious schools violated this section.

¶ 131 In *University of Cumberlands v. Pennybacker*, 308 S.W.3d 668, 679–80 (Ky. 2010), the Kentucky Supreme Court analyzed a section of the Kentucky Constitution that prohibited public funds from being "appropriated to, or used by, or in aid of, any church, sectarian or denominational school." Ky. Const. § 189.. The court decided that this section barred the legislature from appropriating money to build a pharmacy school building on the campus of a Baptist college.

¶ 132 I am persuaded by the reasoning in these cases, and I would follow them here.

¶ 133 In doing so, I recognize that the Supreme Courts of Wisconsin and Ohio have reached a different result. *Simmons–Harris v. Goff*, 86 Ohio St.3d 1, 711 N.E.2d 203 (1999) (interpreting state constitutional section as having the same meaning as the Establishment Clause); *Jackson v. Benson*, 218 Wis.2d 835, 878, 578 N.W.2d 602, 621 (1998) (same). Those cases are distinguishable because the constitutional language that they interpret is substantially different from section 7. The Ohio Constitution section states, "no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this state." Ohio Const. art. VI, § 2. The Wisconsin Constitution section states, "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." Wis. Const. art. I, § 18. Further, based on the analysis in this dissent, I disagree with the reasoning in those opinions.

¶ 134 The United States Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), supports my position. There, the Washington legislature created a scholarship program in postsecondary education. But because a section of the Washington Constitution barred the use of public funds for religious instruction, Wash. Const. art. 1, § 11, the legislature stated that the scholarship could not be employed to gain "a degree in theology." *Id.* at 715–16, 124 S.Ct. 1307 (quoting Wash. Rev. Code § 250.80.020(12)(f)).

¶ 135 *Locke* held that the prohibition of such use of public funds was constitutional because it

imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community. And it does not require students to choose between their religious beliefs and receiving a government benefit. The State has merely chosen not to fund a distinct category of instruction.

*Id.* at 720–21, 124 S.Ct. 1307 (citations omitted).

¶ 136 *Locke* recognized that there is "play in the joints" between the Free Exercise and Establishment Clauses, which means that there is room for some "state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.* at 718–19, 124 S.Ct. 1307 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)).

¶ 137 Although the section of the Washington Constitution that *Locke* addressed is different from the one at issue here, I am convinced that section 7 fits comfortably into the space created by the "play in the joints" that *Locke* described. Section 7 does not create civil or criminal penalties; it does not discourage any person professing any faith from participating in political affairs; and it does not require anyone to avoid or renounce the governmental benefit in question, which is a secular education.

¶ 138 Other courts have reached similar conclusions when evaluating state constitutional sections or statutes that prohibit funding religious schools. *Wirzburger v. Galvin*, 412 F.3d 271, 280–81 (1st Cir.2005) (Massachusetts constitutional section barring popular initiatives that would channel public financial support to religiously affiliated schools was constitutional under *Locke* ); *Eulitt v. Maine*, 386 F.3d 344, 354 (1st Cir. 2004) ("[*Locke* ] confirms that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they choose to fund secular equivalents of such activity.... The fact that the state cannot interfere with a parent's fundamental right to choose religious education for his or her child does not mean that the state must fund that choice."); *University of Cumberlands*, 308

S.W.3d at 679–80 ("*Locke* ... firmly supports our conclusion that the Kentucky Constitution does not contravene the Free Exercise Clause when it prohibits appropriations of public tax monies to religious schools."); *Anderson v. Town of Durham*, 895 A.2d 944, 958–59 (Me.2006) (statute's prohibition of funding religious schools "does not burden or inhibit religion in a constitutionally significant manner"); *Bush*, 886 So.2d at 363–66 ("[L]ike the Washington provision in Locke, the Florida no-aid provision is an expression of a substantial state interest of prohibiting the use of tax funds 'directly or indirectly' to aid religious institutions."); *cf. Chittenden Town Sch. Dist. v. Dep't of Educ.*, 169 Vt. 310, 343–44, 738 A.2d 539, 563 (1999) (pre-*Locke* case; tuition reimbursement plan to parochial schools was unconstitutional under Vermont Constitution section that prohibited the use of public funds to pay for religious worship; the state constitutional section did not violate the Free Exercise Clause).

¶ 139 Applying this authority, I would conclude that section 7 does not violate the Establishment Clause. Rather, it permissibly sets forth a different, more restrictive non-establishment standard. This is because there are "strong state antiestablishment interests in prohibitions on the support of religious establishments," *University of Cumberlands*, 308 S.W.3d at 680, such as private elementary, middle, or high schools "controlled by any church or sectarian denomination." Section 7; *see Bush*, 886 So.2d at 357-61.

#### C. Americans United, Zelman, and Colorado Christian University

¶ 140 There are three cases at the core of the contention that the express language of section 7 does not control the outcome here. I do not believe that these cases dictate such a conclusion, and I think that there are strong and principled reasons for distinguishing them. I address them in the following order: *Americans United for Separation of Church and State Fund v. State*, 648 P.2d 1072 (Colo.1982); *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002); and *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir.2008).

### 1. *Americans United*

#### a. Interpretation of Section 7

¶ 141 The supreme court observed in *Americans United* that, when "interpreting the Colorado Constitution ... we cannot erode or undermine any paramount right flowing from the First Amendment." *Americans United*, 648 P.2d at 1078. I read this statement as being no more than the important, but unremarkable, recognition that sections of a state constitution cannot eliminate the protections of the First Amendment. *See Curious Theatre Co.*, 220 P.3d at 551.

¶ 142 However, once that principle is understood and followed, the supreme court also made clear that the boundaries of section 7 are *not* the same as those of the First Amendment. Rather, the court stated the opposite. It recognized that, although section 7 "address[es] interests not dissimilar in kind to those embodied" in the Free Exercise and Establishment Clauses, "First Amendment jurisprudence" is not "necessarily determinative of state constitutional claims," although such jurisprudence "cannot be totally divorced from the resolution of these claims." *Americans United*, 648 P.2d at 1078. Thus, "resolution of issues under [section 7] ultimately *requires* analysis of the text and purpose of that section." *Conrad v. City & Cnty. of Denver*, 656 P.2d 662, 667, 671 (Colo.1982) (emphasis supplied) (describing the court's analysis of the scope of the Preference Clause of Colo. Const. art. II, § 4, which addresses religious freedom); *see also Conrad v. City & Cnty. of Denver*, 724 P.2d 1309, 1316 (Colo.1986) ("[U]nder certain circumstances we could find a violation of the Preference Clause [of Colo. Const. art. II, § 4], where, under the same or similar factual circumstances, the United States Supreme Court had declined to find a violation of the Establishment Clause.").

¶ 143 As I see it, the text and purpose of section 7 are significantly different from the text and purpose of the Establishment Clause.

#### b. Universities and Colleges vs. Elementary, Middle, and High Schools

¶ 144 Our supreme court held in *Americans United* that a statutory scheme for the distribution of grants to private and sectarian colleges was, as pertinent here, constitutional under section 7.

¶ 145 However, the supreme court carefully qualified this holding, stating that it was based on "significant differences between the religious aspects of church-affiliated institutions of higher education, on the one hand, and parochial elementary and secondary schools on the other." *Americans United*, 648 P.2d at 1079. The court quoted *Tilton v. Richardson*, 403 U.S. 672, 685–86, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (plurality opinion), as the rationale for this distinction.

> The "affirmative if not dominant policy" of the instruction in pre-college church schools is "to assure future adherents to a particular faith by having control of their total education at any early age".... There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination.... The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the congressional objectives and limitations. Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students.

*Americans United*, 648 P.2d at 1079.

¶ 146 The supreme court repeated this distinction when specifically addressing the constitutionality of the statute under section 7.

> [T]he financial assistance is available only to students attending institutions of higher education. Because as a general rule religious indoctrination is not a substantial purpose of sectarian colleges and universities, there is less risk of religion intruding into the secular educational function of the institution than there is at the level of parochial elementary and secondary education.

*Id.* at 1084.

¶ 147 The distinction between colleges and universities, on the one hand, and elementa-

ry, middle, and high schools, on the other hand, in cases involving the establishment of religion has been reinforced in contexts analogous to the one at issue here. For example, in *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), the United States Supreme Court held that school-sanctioned prayers at a public high school football game were unconstitutional under the Establishment Clause. The Court observed that "adolescents are often susceptible to pressure from their peers toward[ ] conformity, and that the influence is strongest in matters of social convention." *Id.* at 311–12, 120 S.Ct. 2266 (quoting *Lee v. Weisman*, 505 U.S. 577, 593, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)).

¶ 148 In *Tanford v. Brand*, 104 F.3d 982, 985–86 (7th Cir.1997), the Seventh Circuit Court of Appeals held that a short, nonsectarian prayer and benediction offered at a university graduation ceremony did not violate the Establishment Clause. The court's rationale was, at least in part, based on its observation that university students are more mature than younger students, and they are thus less likely to compromise their principles. *See also Widmar v. Vincent*, 454 U.S. 263, 274 n. 14, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ("[University students] are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion."); *Chaudhuri v. Tennessee*, 130 F.3d 232, 239 (6th Cir.1997) ("The [United States] Supreme Court has always considered the age of the audience an important factor in the analysis [of Establishment Clause cases]."); cf. *Morse v. Frederick*, 551 U.S. 393, 410, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) ("The [Free Speech Clause of the] First Amendment does not require schools to tolerate at school events student expression that contributes to [the dangers of illegal drug use]."); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ("[E]ducators do not offend [the Free Speech Clause of] the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.").

2. *Zelman*

¶ 149 *Zelman* held that an Ohio scholarship program that provided public money as scholarships to students who elected to attend religiously affiliated private schools did not violate the Establishment Clause. The majority reasoned that the program was neutral toward religion; that private parental choice, not school district choice, routed the scholarship money to the religiously affiliated private schools; and that all schools in the district, public and private, could participate in the program. *Zelman*, 536 U.S. at 662–63, 122 S.Ct. 2460.

¶ 150 *Zelman* does not control the outcome here because it only analyzed the program under the Establishment Clause. It obviously did not mention section 7, and it did not address the effect that specific language, such as that found in section 7, would have on its analysis. For these reasons, *Zelman* is neither dispositive of, nor persuasively helpful in, figuring out how section 7 should be read.

¶ 151 Further, *Zelman* did not hold that the Ohio scholarship program was *mandated* by the Establishment Clause. Rather, the Supreme Court concluded that the Establishment Clause did not prohibit the program. Thus, *Zelman* leaves open the question whether a state constitutional section can prohibit such a program.

¶ 152 Moreover, I think that the Choice Scholarship Program suffers from fundamental defects that the programs examined in *Zelman* and *Americans United* did not display.

¶ 153 For example, parental choice is restricted. "[O]nce a pupil has been accepted into a qualified school under [the] program, the parents ... have no choice; they must endorse the check ... to the qualified school." *Cain*, 220 Ariz. at 83, 202 P.3d at 1184.

¶ 154 Second, focusing on parental choice does not, as a matter of state constitutional law, sufficiently ameliorate other problems associated with the program. As Justice Breyer pointed out in his dissent in *Zelman*, 536 U.S. at 728, 122 S.Ct. 2460, such focus does not consider the interests of those tax-

payers who do not want to pay for the religious education of children. And it says nothing about the interests of the adherents of minority religions who are too few to build their own schools.

¶ 155 Third, students who participate in the program must be accepted by *two* schools, the private school and the Choice Scholarship School, which the school district describes as a charter school. Even though charter schools must be "public, nonsectarian, nonreligious, non-home-based school[s] which operate[ ] within a public school district," § 22–30.5–104(1), C.R.S.2012, the manner in which the Choice Scholarship School is operated demonstrates that the school district is significantly entangled with private religious schools. Although students in the program attend private schools, they are counted as part of the school district's enrollment for purposes of receiving "per pupil" revenue from the state. Not every school in the school district participates in the program. The school district actively recruited some of the private religious schools that participate in the program, and some schools in the program are not in the district.

### 3. *Colorado Christian University*

¶ 156 *Colorado Christian University* involved the same statutory scholarship program that our supreme court analyzed in *Americans United.* Relying on precedent from the United States Supreme Court, our supreme court concluded in *Americans United* that one of the reasons that the statute did not violate the Establishment Clause was because it permitted students attending "sectarian" schools to obtain scholarships, but it denied scholarships to students attending "pervasively sectarian" schools. *Americans United,* 648 P.2d at 1079–81, 1083–84.

¶ 157 The Tenth Circuit held that the distinction between "sectarian" and "pervasively sectarian" schools violated the Establishment Clause by "expressly discriminat[ing] among religions" in a manner that involved "unconstitutionally intrusive scrutiny of religious belief and practice." *Colorado Christian University,* 534 F.3d at 1250.

¶ 158 We are not bound by the Tenth Circuit's decision. *Carter v. Brighton Ford, Inc.,* 251 P.3d 1179, 1182 (Colo.App.2010). More importantly, I respectfully submit that the distinction between sectarian and pervasively sectarian is a red herring in *this* case. The fulcrum on which the holding in *Colorado Christian University* balanced was discrimination *among* religions, based on a distinction between sectarian and pervasively sectarian schools. *Colorado Christian University,* 534 F.3d at 1257–60. My reading of section 7 is that it denies funding to *all* private religious schools, and that, as a result, (1) there is no possible discrimination resulting in some private religious schools receiving funding and others not, *see id.* at 1258; and (2) there is no requirement for government to engage in the sort of "intrusive scrutiny" into the particulars of "religious belief and practice," *see id.* at 1261–66.

¶ 159 In my view, section 7 does not focus on differences among religious doctrines, but on whether the controlling entity is *any* church or sectarian denomination. Indeed, I think that the Tenth Circuit *agrees* with this analysis. *Colorado Christian University* recognizes that section 7 "makes no distinction among religious institutions on the basis of the pervasiveness of their sectarianism." *Id.* at 1268. As a result, the "exclusionary provisions of the statute," which were based on the distinction between sectarian and pervasively sectarian institutions, are "a square peg with respect to the ... round hole" of section 7. *Id.*

¶ 160 It is easy enough, in my view, to determine whether the controlling entity is *any* church or sectarian denomination. This analysis does not require making the intrusive inquiries into the particulars of religious belief and practice that are necessary to determine whether an institution is sectarian or pervasively sectarian. Rather, it focuses on much broader, much less intrusive questions. For example, how does the entity refer to itself? Does it define its school, or the students who attend the school, in terms of religion? *See Mitchell v. Helms,* 530 U.S. 793, 845, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (O'Connor, J., concurring). Does it put its school to religious uses, such as teaching religious doctrine and engaging in religious indoctrination? *See Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.,* 509 F.3d 406,

424–25 (8th Cir.2007). Does it claim that the school is exempt from property taxation under Colorado Constitution article X, section 5? *See Maurer v. Young Life,* 779 P.2d 1317, 1333 n. 21 (Colo.1989) ("Avoiding a narrow construction of property tax exemptions based upon religious use ... serves the important purpose of avoiding any detailed governmental inquiry into or resultant endorsement of religion that would be prohibited by the [E]stablishment [C]lause...."). The inquiry would simply "consider[ ] the character of the [school's] owner and ... the uses of the [school's] propert[y]." *Id.* at 1331.

¶ 161 I would, therefore, conclude that *Colorado Christian University* is simply inapposite.

### III. Section 7's Origins

¶ 162 One of the contentions here is that section 7 was brewed in a cauldron of anti-Catholic prejudice that was bubbling throughout the United States at the time that Colorado's constitutional convention was held. The principal basis for this contention is the controversy surrounding the so-called Blaine Amendment, a proposed, but ultimately defeated, amendment to the United States Constitution. But before I explain the Blaine Amendment, I must put it in context. And to put it in context, I must provide a short history of public schools in our country.

### A. Public Schools in the Nineteenth Century

¶ 163 The concept of nonsectarian public schools, called "common schools" when they were originally introduced, was a product of early nineteenth century American leaders who thought that "the education of children was indispensable for the stability and ultimate success of the new republic." Steven K. Green, *The Insignificance of the Blaine Amendment,* 2008 B.Y.U. L.Rev. 295, 301 (2008). Because "[p]ublic schools were seen as indispensable for inculcating the civic, moral, and religious virtues upon which the republic depended," there was a consensus for about the first half of the nineteenth century that the public school curriculum should contain a religious component. *Id.*

¶ 164 This component was primarily Protestant, but, as the nineteenth century unfolded, "in order to ensure that the schools were accessible to children of all faiths, the curriculum would deemphasize religious doctrine out of respect for liberty of conscience and the theological differences of various denominations." *Id.* at 302–03. The concept of "nonsectarian" public schools was designed to defuse "conflict among Protestant sects and to attract children excluded from the Protestant denominational schools." *Id.* at 304.

¶ 165 At the beginning of the nineteenth century, there was little conflict between Catholics and Protestants over the religious component of public school curriculums. The American Catholic population was relatively small. *Id.* However, as increasing numbers of Catholic and Jewish immigrants came to this country, attributes of the religious component of the public school curriculum became controversial. "[T]he Protestant prayer, Bible reading, hymn singing, and catechism found in books such as The McGuffey Reader became offensive to Catholics and the small number of American Jews." *Id.* The King James Version of the Bible was read in the common schools, which affronted Catholics. Noah Feldman, *Non–Sectarianism Reconsidered,* 18 J.L. & Pol. 65, 84–85 (2002).

¶ 166 Catholics asked that the Bible not be read in public schools. Protestant nativists replied that Catholics wanted schools to be "irreligious." *Id.* at 86. There were significant expressions of anti-Catholic sentiment and some anti-Catholic violence. *Id.* This already troublesome situation was exacerbated by the emergence of the anti-Catholic "Know–Nothing" movement in the 1850s. Meir Katz, *The State of Blaine: A Closer Look at the Blaine Amendments and Their Modern Application,* 12 Engage: J. Federalist Soc'y Prac. Groups 111, 112 (2011); *see also Zelman,* 536 U.S. at 720–21, 122 S.Ct. 2460 (Breyer, J., dissenting) (describing conflicts between Catholics and Protestants).

¶ 167 Partly in reaction to these expressions and this violence, Catholics established their own schools, which were "profoundly sectarian and exclusionary." Feldman, 18 J.L. & Pol. at 86, 88–91. The Catholic Church argued that, if public tax money was to be allocated to public schools that read a

Protestant Bible and taught Protestant principles, then Catholic schools should also be funded with public tax money. Katz, 12 Engage: J. Federalist Soc'y Prac. Groups at 112.

¶ 168 There were also people who believed that no religious schools should be funded with public money. This "no-funding" concept

arose out of several complementary rationales. Foremost, public school officials sought to prevent the division of school funds in order to secure the financial stability of the nascent common schools. In the early nineteenth century, public commitment to a system of public education did not come naturally and had to be earned. Competing educational options stood in the way of gaining this public commitment. Closely related, public officials viewed the no-funding principle as a means to standardize education and to ensure financial accountability.

Green, 2008 B.Y.U. L.Rev. at 310 (footnote omitted).

¶ 169 A de-emphasis of the Protestant religious component in public schools began with reformers like Horace Mann. He encouraged a "shift from instruction in nondenominational Protestantism toward an emphasis on universal religious values." Green, 2008 B.Y.U. L.Rev. at 305. Although Mann believed that schools should teach the basics of Christianity, he thought that schools should go no further "out of respect for freedom of conscience." Id. Mann's reforming instincts were not motivated by anti-Catholicism. Rather, he thought that, because Catholics and Protestants were Christians, both groups should participate in public schools instead of building their own school systems. Id. at 306–07.

¶ 170 A second reform movement began after the Civil War. It "sought to make public education not simply nondenominationally religious but truly nonsectarian, in that only universally acknowledged *moral* principles would be taught and religious devotion eliminated." Id. at 307 (emphasis in original). One way in which this goal would be accomplished would be by eliminating the reading of the Bible from public schools. Id. at 307–09.

¶ 171 Thus, "educational leaders and public officials increasingly came to identify the no-funding principle with principles of religious non-establishment." Id. at 310. And these leaders and officials saw several ways in which funding religious schools would violate the concept of non-establishment: such funding would "violate[ ] rights of conscience to force one person to pay for another's religious instruction; ... would bring about religious dissension over the competition for funds; and ... would result in ecclesiastical control over public monies." Id.

¶ 172 In summary,

[t]he Nation's rapidly developing religious heterogeneity, the tide of Jacksonian democracy, and growing urbanization soon led to widespread demands throughout the States for secular public education. At the same time strong opposition developed to the use of the States' taxing powers to support private sectarian schools. Although the controversy over religious exercises in the public schools continued into [the Twentieth Century], the opponents of subsidy to sectarian schools had largely won their fight by 1900. In fact, after 1840, no efforts of sectarian schools to obtain a share of public school funds succeeded. Between 1840 and 1875, 19 States added provisions to their constitutions prohibiting the use of public school funds to aid sectarian schools, and by 1900, 16 more States had added similar provisions. In fact, no State admitted to the Union after 1858, except West Virginia, omitted such provision from its first constitution.

Lemon v. Kurtzman, 403 U.S. 602, 646–47, 91 S.Ct. 2125, 29 L.Ed.2d 745 (1971) (Brennan, J., concurring in part and dissenting in part) (citations and footnote omitted).

¶ 173 With this understanding of the context, I turn to the controversy surrounding the proposed Blaine Amendment.

### B. The Blaine Amendment

¶ 174 By 1875, many members of the Republican Party thought their party was in political trouble. The nation had tired of the failures associated with Reconstruction and with the corruption in President Grant's administration. Democrats had gained control

of the House of Representatives in 1874, and it appeared that a Democrat might win the White House in 1876, with the assistance of the reconstructed, and strongly Democratic, southern states. Republicans "needed an issue," and they found it in the controversy over the funding of public schools. Green, 2008 B.Y.U. L.Rev. at 321–22.

¶ 175 In September 1875, President Grant, a Republican, gave a speech in which he stated that church and state should be kept "forever separate" and that "not one dollar" should be "appropriated in support of sectarian schools." Feldman, 18 J.L. & Pol. at 98 (quoting Army of the Tennessee—A Speech by Gen. Grant, N.Y. Daily Tribune, Oct. 1, 1875, at 1).

¶ 176 The President followed this speech with an address to Congress in which he proposed a constitutional amendment that would require "each of the several States to establish and forever maintain free public schools adequate to the education of all the children." Katz, 12 Engage: J. Federalist Soc'y Prac. Groups at 112 (quoting 4 Cong. Rec. 175 (1875)). This amendment would have also barred the use of "any school funds, or school taxes ... for the benefit or in aid ... of any religious sect or denomination." Id.

¶ 177 James G. Blaine, the Republican Speaker of the House of Representatives, sponsored the amendment that the President had proposed. His amendment was easily approved by the House of Representatives, but it died in the Senate, where it failed to muster the necessary two-thirds majority. Id.

¶ 178 The amendment was attacked as being anti-Catholic, and some of its supporters made unambiguously anti-Catholic statements. For example, at least one senator argued that the amendment was necessary because the Catholic Church discouraged liberty of conscience. Another senator countered that the amendment was motivated by religious bias against Catholics. Id. A plurality of the United States Supreme Court has stated that consideration of the Blaine Amendment "arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that 'sectarian' was code for 'Catholic.'" Mitchell, 530 U.S. at 828, 120 S.Ct. 2530.

¶ 179 Some commentators argue that anti-Catholic prejudice, which undoubtedly existed and which undoubtedly still exists in the minds of some people, was the sole, or at least the primary, motivating factor for the Blaine Amendment. E.g., Katz, 12 Engage: J. Federalist Soc'y Prac. Groups at 111–12; Mark Edward DeForrest, An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns, 26 Harv. J.L. & Pub. Pol'y 551, 565–73 (2003); Joseph P. Viteritti, Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law, 21 Harv. J.L. & Pub. Pol'y 657, 659 (1998).

¶ 180 However, other commentators take a more nuanced view, arguing that there was much more going on with the Blaine Amendment than anti-Catholic bigotry. For example, one professor argues that the Blaine Amendment arose as "part of a larger controversy over the responsibility and role of government in public education"; that this "larger controversy" involved people of all faiths, who struggled over whether public education should be "secular, nonsectarian, or more religious"; and that "[i]dentifying a singular motive for the Blaine Amendment is impossible." Steven K. Green, "Bad History": The Lure of History in Establishment Clause Adjudication, 81 Notre Dame L.Rev. 1717, 1743 (2006); see also, e.g., Steven K. Green, "Blaming Blaine": Understanding the Blaine Amendment and the "No–Funding" Principle, 2 First Amend. L.Rev. 107, 113–14 (2003); Jill Goldenziel, Blaine's Name in Vain?: State Constitutions, School Choice, and Charitable Choice, 83 Den. U.L.Rev. 57, 64 (2005) ("Blaine maintained that he was not anti-Catholic, and no evidence suggests that he had any personal animosity toward Catholics. Blaine's mother was Catholic and his daughters were educated in Catholic schools. Publicly, Blaine maintained that the amendment was merely meant to settle the 'School Question,' the day's most heated political issue."); Feldman, 18 J.L. & Pol. at 115 ("Certainly no attempt to make sense of the legacy of non-sectarianism ought to ignore the strains of anti-Ca-

tholicism that run through its reception. But one of [the author's purposes] has been to consider another, parallel legacy of nonsectarianism—particularly, the aspiration to imparting shared moral values through the identification of common foundational commitments.").

¶ 181 And there were those who supported the Blaine Amendment because they thought it would defuse the conflict between Protestants and Catholics over school funding that had been simmering for decades. For example, the Democratic New York Tribune observed that

> [t]hinking men of all parties see much more to deplore than to rejoice over, in the virulent outbreak of discussions concerning the churches and the schools, and welcome any means of removing the dangerous question from politics as speedily as possible.

Green, 2008 B.Y.U. L.Rev. at 323 (citing N.Y. Trib., Dec. 15, 1875, at 4). The Republican New York Times expressed similar sentiments. *Id.* (citing N.Y. times, Dec. 15, 1875, at 6).

C. Colorado's Constitutional Convention

¶ 182 In 1875, Congress passed an enabling act that, in section 1, authorized inhabitants of the Territory of Colorado to "form ... a state government ... which, when formed, shall be admitted into the Union." *Proceedings of the Constitutional Convention* 9 (Smith-Brooks Press, State Printers 1907). As pertinent here, the enabling act required that the drafters of Colorado's Constitution

> provide by an ordinance irrevocable without the consent of the United States and the people of [the State of Colorado] ... [t]hat perfect toleration of religious sentiment shall be secured, and no inhabitant of [the State of Colorado] shall ever be molested in person or property, on account of his or her mode of religious worship.

*Id.* at 10. The constitutional convention passed such an ordinance on the first day that it met. *Id.* at 15.

¶ 183 The constitutional convention in which the Colorado Constitution was drafted was in session intermittently between December 20, 1875, and March 15, 1876. *Id.* at 15, 709, 716–17. There were thirty-nine dele-

gates, twenty-four Republicans and fifteen Democrats. Dale A. Oesterle and Richard B. Collins, *The Colorado State Constitution: A Reference Guide* 6 (Greenwood Press 2002).

¶ 184 As relevant here, the delegates engaged in three "heated" debates over religious matters. *Id.* at 7. Should property owned by religious institutions be taxed? Should God be mentioned in the constitution's preamble? Should public school funds be allocated to private religious schools?

¶ 185 The issue of taxation of churches eventually resulted in a moderate compromise: "unless the legislature acted to the contrary, lots with buildings used solely for religious worship, for schools, and for charitable purposes, as well as cemeteries not used for profit, [won] tax immunity." Donald W. Hensel, *Religion and the Writing of the Colorado Constitution*, 30 Church History: Studies in Christianity and Culture, Issue 3, 349, 352 (Sept.1961). The compromise was embedded in Colorado Constitution, article X, section 5.

¶ 186 The issue of mentioning God in the Preamble also resulted in a compromise, with Catholics and Protestants cooperating. Hensel at 356, 358. As a result, the Preamble refers to the "Supreme Ruler of the Universe."

¶ 187 Turning to the issue of funding religious schools with public money, early in the constitutional convention, on January 5, 1876, a resolution was referred to the Committee on Education, which contained the concepts, and almost all the language, that became section 7. *Proceedings of the Constitutional Convention* at 43.

¶ 188 Throughout the convention, members of the public presented proposals to the delegates in the form of petitions. Some of these petitions requested a complete separation of church and state in public schools. *Id.* at 83–84, 277, 278. Groups of Protestant churches submitted petitions that made various requests, including that public schools remain "nonsectarian"; that the Bible should be read to students; or that the Bible should neither be "excluded from nor forced into" public schools. *Id.* at 87, 113, 261.

¶ 189 Catholic Bishop Joseph Machebeuf twice addressed the convention in writing. The first petition that he submitted suggested that, if the state constitution denied Catholic schools public funds, Colorado's Catholics would feel "bound in conscience" to oppose the constitution's ratification. *Id.* at 235.

¶ 190 According to one commentator, Bishop Machebeuf "opened the door to anti-Catholic fulminations by sending [this] rather tactlessly-worded resolution." Hensel at 353.

> It was not convention action but Bishop Machebeuf's participation which evidently publicized the issue throughout the territory. Had it not been for his demands, an editor asserted, the delegates would have ignored the question.

*Id.* at 354.

¶ 191 Bishop Machebeuf's second written presentation sought to mollify the delegates. He wrote of anti-Catholic prejudice, and he apologized for any "threats and aggressive tone" that the delegates may have perceived in his first submission. *Proceedings of the Constitutional Convention* at 330–32. However, he did not back away from his argument that Colorado's Constitution should not prohibit the state from funding Catholic schools. *Id.*

¶ 192 Bishop Machebeuf's written comments expressed a sincere, important, and strong commitment to opposing anti-Catholic bigotry. However, there is evidence that suggests that he was also motivated by financial considerations.

> Since the enabling act set aside two sections in every township to support the public schools, one-eighteenth of the territory's public lands was at stake. By this same act such land could not be sold for less than $2.50 an acre. Even with much of the public land depleted by sale, the value of the school lands was at least $5,000,000, an unusually tempting prize.

Hensel at 353.

¶ 193 There was immediate and strong reaction to the Bishop's comments. One commentator expressed the opinion that Bishop Machebeuf "imperiled the constitution's ratification with his intimidations." *Id.* at 354. An editor of a Denver newspaper "wondered what would happen if the Baptists, Methodists, or Jews threatened to defeat the consti-

tution unless it allowed their dogmas to be taught at public expense." *Id.*

¶ 194 A motion to strike the entire text of what was to become section 7 failed, three votes in favor, twenty-four votes against. The language was then approved, twenty-five votes in favor, three votes against. *Proceedings of the Constitutional Convention* at 357–58.

¶ 195 The delegates did not insert language in the constitution that directly addressed the reading of the Bible in public schools. However, they

> rejected the assumption that Bible-reading was indispensable evidence that the schools were moral institutions. A citizen put it simply: the Bible could take care of itself and need no "legislation to bolster it up." Another observer applauded the decision to "let religion be taught in the family circle, in the church, and in the Sunday school."

Hensel at 356.

¶ 196 When the delegates finished their work in March 1876, they had

> decided that parochial schools could not share in the public school fund, and that public schools could not teach sectarian religious dogma. On these two issues alone the convention refused to compromise contending factions. The Protestant majority saw to that. To strengthen the separation of church and state, Coloradans had to pay an initial price of animosity to avoid later and more corrosive bitterness.

*Id.*

¶ 197 The ratification vote was held on July 1, 1876. Two days before the vote, "Catholics conducted a pro-constitution rally in Denver." Donald Wayne Hensel, *A History of the Colorado Constitution in the Nineteenth Century,* at 224 (unpublished doctoral thesis, University of Colorado 1957).

¶ 198 The final vote tally was 19,505 votes: 15,443 Coloradoans voted for ratification; 4,062 voted against it. Elmer Herbert Meyer, *The Constitution of Colorado,* The Iowa Journal 271 (State Historical Society of Iowa, Apr. 1904), *available at* www.archive.org/stream/publicarchivesof00paxsrich/publicarchivesof00paxsrich_djvu.txt. On August 1,

1876, President Grant issued a proclamation stating that "the admission of the State of Colorado into the union is now complete." *Proceedings of the Constitutional Convention* at 735.

¶ 199 Section 7 was not, and is not, unique. Although different commentators produce different figures, the constitutions of between thirty-five and forty states contain similar sections limiting or prohibiting funding of religious schools. Green, 2008 B.Y.U. L.Rev. at 327. Of these sections, seventeen were in place before the controversy over the Blaine Amendment erupted. These could have "easily served as models for the post-Blaine provisions." *Id.* at 328; *see also Blaine's Name in Vain?: State Constitutions, School Choice, and Charitable Choice,* 83 Den. U.L.Rev. at 66–70. The delegates to Colorado's constitutional convention were aware of at least some of these other sections. Hensel at 354.

## IV. Free Exercise Clause and Equal Protection Attacks on Section 7

¶ 200 Some of the parties supporting the school district's position contend that section 7 was a product of anti-Catholic prejudice. Citing cases such as *Romer v. Evans,* 517 U.S. 620, 633–43, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), and *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 540, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), they argue that this constitutional amendment imposes a disadvantage on religion that was "born of animosity toward the class of persons affected." *Romer,* 517 U.S. at 634, 116 S.Ct. 1620. They submit that section 7 violates the Free Exercise and the Equal Protection Clauses because its drafters, either overtly or covertly, wrote section 7 with the reprehensible intent of "oppress[ing] a religion [and] its practices." *Church of Lukumi Babalu Aye,* 508 U.S. at 547, 113 S.Ct. 2217. They urge that we should focus on the "historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 540, 113 S.Ct. 2217.

¶ 201 I respectfully disagree with these arguments for two reasons. First, when the language of constitutional sections is clear, as is the case with section 7, I question the appropriateness of proceeding further analytically. Second, I do not read the historical record in Colorado as clearly supporting the thesis that section 7 was the direct, ineluctable, and sole product of anti-Catholic animosity.

¶ 202 It is well-established law in Colorado that, if the language of a constitutional section is clear and unambiguous, we do not resort to other modes of interpretation to determine its meaning. *See Rodriguez,* 112 P.3d at 696. And I cannot read the plain language of section 7 as espousing a narrowly anti-Catholic view. Rather, I read the language as having a different, and broader, scope: it applies to all religious institutions. As our supreme court observed in *People ex rel. Vollmar v. Stanley,* 81 Colo. 276, 287, 255 P. 610, 615 (1927), *overruled by Conrad,* 656 P.2d at 670 n. 6,

[s]ectarian meant, to the members of the [constitutional] convention and to the electors who voted for and against the Constitution, "pertaining to some one of the various religious sects," and the purpose of . . . section 7 was to forestall public support of institutions controlled by such sects.

¶ 203 Section 7 refers to "*any* church or sectarian society"; to "*any* school [or] academy . . . controlled by *any* church or sectarian denomination *whatsoever*"; and to "*any* church, or for any sectarian purpose." (Emphasis supplied.) Even assuming, for the purposes of argument, that the use of the word "sectarian" refers either to the teachings of the various Protestant sects, *see* Green, 2008 B.Y.U. L.Rev. at 304, or that it is code for "anti-Catholic," *see Mitchell,* 530 U.S. at 828, 120 S.Ct. 2530, section 7 accompanies the word "sectarian" with much broader words: "denomination," "church," "any," and "whatsoever." And section 7's prohibition of distributions to all religious schools controlled by churches or sectarian denominations is categorical. A school district cannot "ever" make an appropriation; it cannot pay from "any public fund or money's whatever, [or] anything in aid."

¶ 204 And, if we are to look to the statements, events, and history behind these constitutional sections to determine whether they were the products of anti-Catholic animus, *see Church of Lukumi Babalu 'Aye*, 508 U.S. at 540, 113 S.Ct. 2217, to what do we look, and upon whose intent do we focus? This is a difficult, perhaps impossible, task in a context like the one we face here. See *id.* at 558, 113 S.Ct. 2217 (Scalia, J., concurring) ("[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body, and this Court has a long tradition of refraining from such inquiries." (citations omitted)).

¶ 205 Are we concerned with the intent of the delegates at the convention? At least as far as I can tell, the historical record of Colorado's constitutional convention does not contain their speeches or their verbatim or summarized comments about the substance of section 7. If we do not know their thoughts, at least as expressed by their words, how can we tar all, or many, or a few, of them with the brush of religious bias?

¶ 206 Or are we to determine the intent of the voters who ratified the Colorado Constitution? What was their understanding of section 7? *See Rodriguez*, 112 P.3d at 696. Did all 15,443 Coloradans who voted for ratification think that section 7 discriminated against Catholics, and did they wish to achieve such discrimination? Did all 4,062 Coloradans who voted against ratification oppose it because they understood section 7 to be the product of bigotry? We do not know.

¶ 207 And even if a historical inquiry is necessary to determine whether section 7 was produced by "animosity toward the class of persons affected," *see Romer*, 517 U.S. at 634, 116 S.Ct. 1620, I think that the historical record indicates that many forces were at work during our constitutional convention.

¶ 208 Although the congressional debate about the Blaine Amendment occurred essentially contemporaneously with our constitutional convention, that debate concerned much more than religious bigotry. How can Republican political interests best be preserved against growing Democratic power? How should public schools be funded? Should the evolution of public schools toward becoming entirely secular continue? Is it important to have public schools that teach common values? Is it important to keep public schools free of religious control and churches free of government control? *See Lemon*, 403 U.S. at 646–47, 91 S.Ct. 2125 (Brennan, J., concurring in part and dissenting in part); *"Bad History": The Lure of History in Establishment Clause Adjudication*, 81 Notre Dame L.Rev. at 1743; *"Blaming Blaine": Understanding the Blaine Amendment and the "No–Funding" Principle*, 2 First Amend. L.Rev. at 113–14; Feldman, 18 J.L. & Pol. at 115.

¶ 209 It is undeniable that anti-Catholic prejudice existed in Colorado at the time of our constitutional convention, and that there was friction between Catholics and Protestants. *See Proceedings of the Constitutional Convention* at 330–32 (written address of Bishop Machebeuf); *The Colorado State Constitution: A Reference Guide* at 7. However, the following factors convince me that it is not clear that such bias was the sole motivation, or even the primary driving force, behind the drafting and ratifying of section 7.

¶ 210 The congressional enabling act that authorized the citizens of Colorado to proceed to become a state expressly required that any state constitution contain an ordinance stating that "perfect toleration of religious sentiment shall be secured, and no inhabitant of [the State of Colorado] shall ever be molested in person or property, on account of his or her mode of religious worship." *Proceedings of the Constitutional Convention* at 10.

¶ 211 A proposal containing the language that became section 7 was submitted by a subcommittee to the convention's delegates before the records of the convention refer to any dispute about its subject matter. *See id.* at 43. Section 7's language is substantially the same as the language contained in the initial proposal.

¶ 212 The various petitions concerning the issue of funding religious schools espoused substantially different views. These included petitions from Protestants, Catholics, and those who expressed a desire for secular schools. *See The Colorado State Constitution: A Reference Guide* at 7.

¶ 213 The language of section 7 applies to all religious institutions, not only the Catholic Church. It uses words such as "sectarian," "church," "denomination," "any," and "whatsoever."

¶ 214 The delegates decided against taxing all church property. They did not vote for taxing Catholic Church property.

¶ 215 Although there had historically been conflict between Catholics and Protestants over which version of the Bible should be read in public schools, *see* Feldman, 18 J.L. & Pol. at 84–85, the delegates did not mandate that the King James Version should be read in public schools, *see* Hensel at 356.

¶ 216 There is evidence to suggest that Bishop Machebeuf fanned the flames of the dispute between Catholics and Protestants in the course of the convention; the dispute might well not have arisen had he not attempted to "intimidate" the delegates; and, although he was rightfully concerned about religious bias against Catholics, he was also motivated by a desire to gain access to the public school fund. *The Colorado State Constitution: A Reference Guide* at 7; Hensel at 353–54. Further, shortly before the ratification vote, at least some Catholics participated in a rally in support of the constitution's ratification. Hensel, *A History of the Colorado Constitution in the Nineteenth Century,* at 224.

¶ 217 One commentator has expressed the opinion that, although there had been disagreements between Catholics and Protestants, the outcome of such friction was eventually salutary. "To strengthen the separation of church and state, Coloradans had to pay an initial price of animosity to avoid later and more corrosive bitterness." Hensel at 356; *see also* Green, 2008 B.Y.U. L.Rev. at 323 (quoting comments from New York City newspaper editors making the same point about the Blaine Amendment).

¶ 218 Section 7 was passed during a time of educational reform, in which "educational leaders and public officials increasingly came to identify the no-funding principle with principles of religious nonestablishment." Green, 2008 B.Y.U. L.Rev. at 307–09.

¶ 219 Although the numbers may vary depending on who is doing the counting, *see id.* at 327, many other states' constitutions contain sections similar to section 7. A goodly portion of these preceded the controversy over the Blaine Amendment. It is difficult to believe that so many states, for over more than one hundred years, *see Lemon,* 403 U.S. at 646–47, 91 S.Ct. 2125 (Brennan, J., concurring in part and dissenting in part), would deliberately enshrine anti-Catholic prejudice in their constitutions. *See University of Cumberlands,* 308 S.W.3d at 681–82 (Kentucky constitutional section was not an anti-Catholic "Blaine amendment"); *Bush,* 886 So.2d at 351 n. 9 ("[T]here is no evidence of religious bigotry relating to Florida's no-aid provision."); *Blaine's Name in Vain?: State Constitutions, School Choice, and Charitable Choice,* 83 Den. U.L.Rev. at 98 ("Analyzing the history of eight so-called Blaine Amendments [including section 7] does not reveal them to be legislatively enacted bigotry.").

¶ 220 As a result, I would reject the arguments that section 7 violates either the Free Exercise or Equal Protection Clauses. *See Wirzburger,* 412 F.3d at 275–85 (Massachusetts constitutional section does not violate Free Exercise or Equal Protection Clauses); *Eulitt,* 386 F.3d at 353–56 (Maine statute does not violate Free Exercise or Equal Protection Clauses); *University of Cumberlands,* 308 S.W.3d at 679–82 (Kentucky constitutional section does not violate Free Exercise or Equal Protection Clauses); *Anderson,* 895 A.2d at 959–61 (Maine statute does not violate Free Exercise or Equal Protection Clauses); *Bush,* 886 So.2d at 362–66 (Florida constitutional section does not violate the Free Exercise Clause); *Witters,* 112 Wash.2d at 370–73, 771 P.2d at 1122–23 (Washington constitutional section does not violate Free Exercise or Equal Protection Clauses).

## V. Conclusion

¶ 221 Lest anyone believe that the position I espouse here is a "legalistic swipe at religion," *see University of Cumberlands,* 308 S.W.3d at 686 (Cunningham, J., concurring), I respectfully submit that the history of religious oppression and conflict throughout the course of our grand American experiment, *see id.* is a cautionary tale that should never be forgotten. "[O]ur fundamental belief as a

nation that religion and state should co-exist in harmony with each other, but along distinct and separate tracks" allows religion "to breathe free of the enervating drag of government regulation, taxation and control," *id.* at 687.

¶ 222 This religious freedom is, in my view, an admirable product of "the constitutional division of church and state" that has allowed

[r]eligious schools [to be] free to exist and function in accordance to their own moral and theological dogma. This includes the right to restrict their memberships and their campus academia to strict, sometimes even unpopular, religious views and activities. When state involvement and support begins to be part of their operations, this freedom goes away.

*Id.* at 688. Applying section 7 as written in this case would reduce the problems associated with funding private elementary, middle, and high schools that are controlled by any church or sectarian denomination "whatsoever," while carefully protecting the right of Colorado's citizens to exercise their religious conscience in their homes, churches, synagogues, temples, and private religious schools.

¶ 223 We have, in the years since this nation was founded, become breathtakingly diverse in a religious sense. At least fifty-five major religious groups and subgroups now have roots here, and some of these groups contain sects that express enormously different beliefs. *Zelman*, 536 U.S. at 723, 122 S.Ct. 2460 (Breyer, J., dissenting). It is this diversity, I respectfully suggest, that most starkly points out the great risks in the school district program at issue here.

School voucher programs finance the religious education of the young. And, if widely adopted, they may well provide billions of dollars that will do so. Why will different religions not become concerned about, and seek to influence, the criteria used to channel this money to religious schools? Why will they not want to examine the implementation of the programs that provide this money—to determine, for example, whether implementation has biased a program toward or against particular sects, or whether recipient religious schools are adequately fulfilling a program's criteria? If so, just how is the

State to resolve the resulting controversies without provoking legitimate fears of the kinds of religious favoritism that, in so religiously diverse a Nation, threaten social dissension?